**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DANIEL CHU and DAVID GOODGAME,<br><br>Defendants. | Case No. 25 Cr. 579 (PKC) |

## DAVID GOODGAME'S OMNIBUS MEMORANDUM OF LAW
## IN SUPPORT OF HIS INITIAL PRETRIAL MOTIONS

SPENCER AND ASSOCIATES
5956 Sherry Ln.
Dallas, Texas 75225
Telephone: (214) 358-8500

*Attorneys for David Goodgame*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT BACKGROUND .......................................................................................... 3

    A.    The Government's Investigation ........................................................................ 3

    B.    The Indictment ................................................................................................... 6

    C.    Less than Five Months Before Trial, Discovery is Far From Complete ............. 7

    D.    The Government's Ongoing Grand Jury Investigation ..................................... 10

ARGUMENT ..................................................................................................................... 11

    A.    Legal Standards ............................................................................................... 12

II.    MOTION FOR BILL OF PARTICULARS ON COUNTS TWO, THREE, AND FOUR 13

    A.    The Government Must Particularize Count Two. .............................................. 13

    B.    The Government Must Particularize Counts Three and Four. ........................... 15

III.    MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING .................. 16

    *A.*    Legal Standard Under *Franks* ......................................................................... 17

    B.    The Warrant Affidavits Recklessly Omitted Known Material, Exculpatory Information. ...................................................................................................... 17

    C.    The Omissions Were Material to Probable Cause............................................. 21

    D.    The Court Should Order Disclosure of Unredacted FBI 302s and Underlying Notes of the Kollar and Seibold Interviews .................................. 22

IV.    MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW ...................................................... 23

    A.    The Government Is Required to Present Exculpatory Evidence In the Grand Jury If It Undermines Probable Cause............................................................... 24

    B.    There Is a Particularized Need to Believe the Grand Jury May Have Been Misled. ............................................................................................................. 25

    C.    The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination. ...................................................................................... 29

CONCLUSION ................................................................................................................. 32

# TABLE OF AUTHORITIES

## CASES

Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) ........................................................ 29

Dennis v. United States, 384 U.S. 855 (1966) ............................................................................... 23

Illinois v. Gates, 462 U.S. 213 (1983) .......................................................................................... 20

Toussie v. United States, 397 U.S. 112 (1970) .............................................................................. 15

United States v. Williams, 504 U.S. 36 (1992) .............................................................................. 22

Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979) ................................................. 23

Franks v. Delaware, 438 U.S. 154 (1978) ............................................................. 16, 17, 20, 21

United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003) ............................................................... 20

United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) ................................................................. 25

United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) ...................................................... 12, 13

United States v. Casamento, 887 F.2d 1141 (2d Cir. 1989) .......................................................... 22

United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988) ........................................................ 12, 13

United States v. DiMassa, 117 F.4th 477 (2d Cir. 2024) .............................................................. 14

United States v. Estepa, 471 F.2d 1132 (2d Cir. 1972) ............................................................ 22, 25

United States v. Ferguson, 758 F.2d 843 (2d Cir. 1985) ............................................................... 17

United States v. Gaviria, 740 F.2d 174 (2d Cir. 1984) ................................................................. 14

United States v. Gibson, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) .................................................... 23

United States v. Hennessy, 1993 WL 137766 (S.D.N.Y. Apr. 23, 1993) ....................................... 12

United States v. Ho, 2009 WL 2591345 (D. Haw. Aug. 20, 2009) ................................................ 29

United States v. Hoey, 2014 WL 2998523 (S.D.N.Y. July 2, 2014) ......................................... 28, 29

United States v. Hogan, 712 F.2d 757 (2d Cir. 1983) .............................................................. 24, 25

United States v. Holihan, 236 F. Supp. 2d 255 (W.D.N.Y. 2002) .................................................. 21

United States v. Hussain, 785 F. Supp. 3d 9 (D. Vt. 2025) ........................................................... 14

United States v. Kollar, No. 25 Cr. 584 (S.D.N.Y.) ......................................................................... 6

United States v. Lahey, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ................................................ 18, 19

United States v. Lino, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ..................................................... 16

United States v. Lombardozzi, 491 F.3d 61 (2d Cir. 2007)........................................................... 22

United States v. Mandell, 752 F.3d 544 (2d Cir. 2014).................................................................. 16

United States v. McDermott, 245 F.3d 133 (2d Cir. 2001) ...................................................... 14, 15

United States v. Mermelstein, 487 F. Supp. 2d 242 (E.D.N.Y. 2007)........................................... 15

United States v. Nejad, 436 F. Supp. 3d 707 (S.D.N.Y. 2020)...................................................... 17

United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) .................................................................... 14

United States v. Peralta, 763 F. Supp. 14 (S.D.N.Y. 1991)..................................................... 24, 29

United States v. Perez, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) ......................................... 18, 19, 20

United States v. Pontz, 132 F.4th 10 (1st Cir. 2025) .................................................................... 15

United States v. Priolo, 812 F. Supp. 3d 250 (E.D.N.Y. 2025) .................................................... 15

United States v. Rajaratnam, 719 F.3d 139 (2d Cir. 2013)....................................................... 17, 20

United States v. Rajaratnam, No. 09-cr-1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ............................................................................................................................................... 16

United States v. Reddy, 190 F. Supp. 2d 558 (S.D.N.Y. 2002)..................................................... 13

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) .................................................................. 20

United States v. Seibold, No. 25 Cr. 585 (S.D.N.Y.) ..................................................................... 6

United States v. Siddiqi, 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007)......................................... 12

United States v. Teman, 465 F. Supp. 3d 277 (S.D.N.Y. 2020), aff'd, 2023 WL 3882974 (2d Cir. June 8, 2023)................................................................................................................................. 15

United States v. Twersky, 1994 WL 319367 (S.D.N.Y. June 29, 1994).................................... 29

United States v. Vetere, 663 F. Supp. 381 (S.D.N.Y. 1987) ............................................. 22, 24, 29

United States v. Vilar, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).......................................... 18

United States v. Yashar, 166 F.3d 873 (7th Cir. 1999)................................................................. 15

United States v. Yefsky, 994 F.2d 885 (1st Cir. 1993)................................................................... 12

In re Petition of Craig, 131 F.3d 99 (2d Cir. 1997) ..................................................................... 28

Rivera v. United States, 728 F. Supp. 250 (S.D.N.Y. 1990), aff'd in part, vacated in part, 928 F.2d 592 (2d Cir. 1991)................................................................................................................. 18

United States v. Bin Laden, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) .............................................. 13

United States v. Castellanos, 820 F. Supp. 80 (S.D.N.Y. 1993)................................................. 16

iii

United States v. Dunn, 2005 WL 1705404 (S.D.N.Y. July 19, 2005)......................................... 23

Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000) .............................................................. 18

STATUTES

18 U.S.C. § 225........................................................................................................... 1, 6

18 U.S.C. § 1343 ............................................................................................................. 6

18 U.S.C. § 1344 ............................................................................................................. 6

18 U.S.C. § 1349 ............................................................................................................. 6

RULES

Fed. R. Crim. P. 6(e)(3)(E) ................................................................................ 22, 23, 28

Fed. R. Crim. P. 7(f) ..................................................................................................... 12

Fed. R. Crim. P. 16 ................................................................................... 7, 8, 9, 10, 11

OTHER AUTHORITIES

American Bar Association, Standards for Criminal Justice, Prosecution Function (3d ed. 1993),
Standard 3-3.6(b) ..................................................................................................... 23

U.S. Dep't of Justice, Justice Manual § 9-11.233 (Presentation of Exculpatory Evidence) ......... 23

David Goodgame (Mr. Goodgame) respectfully submits this memorandum of law in support of his initial pretrial motions. These motions are focused on the Indictment itself and then discovery received as of February 19, 2026, per the Court's instructions. Mr. Goodgame also joins in a number of pretrial motions filed by co-defendant Daniel Chu (Mr. Chu) as set forth in Mr. Chu's pre-trial motions and memorandum in support regarding the same. Subsequent discovery, whenever the government substantially completes producing it, will likely give rise to additional motion practice.

## PRELIMINARY STATEMENT

In its Indictment against Mr. Chu and Mr. Goodgame, the Government attempts to shoehorn Mr. Goodgame into an alleged fraud scheme perpetuated by former Chief Financial Officer Jerome Kollar and former Director of Finance Ameryn Seibold, as well as others in the Finance Department and within Tricolor. Some of this effort by the Government may be due to the unusual charge against Mr. Chu of the "continuing financial crimes enterprise" statute, a rarely used-statute which requires at least four persons acting in concert (among other stringent requirements). Indeed, the first twenty-five paragraphs of the Indictment – under the heading, "Count One – Continuing Financial Crimes Enterprise", repeatedly lump Mr. Goodgame into the alleged fraud scheme, relying almost solely on out-of-context statements and communications by Mr. Seibold, before ultimately charging Mr. Chu alone with Count One.

None of these statements or communications suggest that Mr. Goodgame was involved in the underlying fraud, or evidence any specific representations made by Mr. Goodgame whatsoever to Tricolor's lenders, nor are they incorporated in any meaningful way into the charges against Mr. Goodgame in Counts Two through Four. Count Two (conspiracy) vaguely alleges that "Chu, Goodgame, and others agreed to make and cause to be made a series of false statements to lenders,

1

including multiple financial institutions, regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those lenders…".  No specific conduct or statements by Mr. Goodgame is identified in this section, and Goodgame needs to understand the specific allegations against him in order to adequately prepare his defense.

Counts Three (bank fraud) and Four (wire fraud) are similarly vague.  Count Three alleges a scheme to make false statements to Lenders 4 and 5 in connection with the SPV 4 warehouse, but offers no specific act or statement made by Goodgame (or any evidence of a scheme) to support its claim.  Count Four states that Chu, Goodgame, and others schemed to make false statements about Tricolor's financial condition to Lenders 4, 5, 6, and 7, again with no particularly or detail as to what statements were made by Mr. Goodgame at all.  Given that Mr. Goodgame's role at Tricolor did not involve interacting or interfacing with Tricolor's lenders, the Government must provide more detail in order for Mr. Goodgame to prepare his defense.

Separately, and as also noted in the related motions filed by Mr. Chu, there are serious concerns with the Government's investigation, use of the grand jury, and document production that require relief in order for Mr. Goodgame (and Mr. Chu) to adequately prepare for trial.  The affidavits attached to the search warrants in this matter confirm that the Government's case against Mr. Goodgame is predicated almost entirely on statements by Mr. Seibold, as well as scant allegations by Mr. Kollar.  Early in the investigation, prior to seeking any search warrants, the Government interviewed Kollar and Seibold, both of whom disclosed material exculpatory information about Mr. Goodgame.  The Government then selectively relied on those interviews to secure broad search warrants for Mr. Goodgame's person, choosing not to present the exculpatory information it had received.  As with Mr. Chu, Mr. Goodgame notes that Kollar and Seibold both

also pleaded guilty to destruction of records, which materially impacts on their credibility and was not disclosed to the reviewing magistrates.  Mr. Goodgame agrees with Mr. Chu's argument that the fruits of those warrants – while not as extensive as those brought against Mr. Chu – should nonetheless be suppressed, or in the alternative the Court should hold a *Franks* hearing concerning the Government's omission of material exculpatory information in obtaining them.  As with Mr. Chu, Mr. Goodgame should also be provided, now, with the full FBI FD-302s and underlying notes for its interviews of Kollar and Seibold.

Finally, both the Government's selective presentation of evidence and its attempt to paint Mr. Goodgame with the brush of Count One without actually charging him with it raise red flag concerns about the integrity of the grand jury process.  The Indictment was returned just months after the Government obtained the defective warrants, and before any meaningful attempt by the Government to review the resulting evidence (a review which as of this date remains ongoing).  Moreover, a substantial portion of the discovery produced to date in this matter was produced *after* the Indictment was returned.  As such, it seems very likely that the evidence presented to the grand jury focused on the statements of Mr. Kollar and Mr. Seibold, and very little else.  The Court should therefore order the disclosure of the grand jury record, including transcripts and legal instructions, or, at a minimum, conduct *in camera* review to determine whether probable cause was reached on a fair and accurate factual and legal record.

## RELEVANT BACKGROUND

### A.    The Government's Investigation

Mr. Goodgame is the former Chief Operating Officer of Tricolor, an auto lender and retailer that offered credit-building loans to consumers with limited or no credit history.  Tricolor was founded in 2007 and operated continuously until September 2025, when it filed for bankruptcy.  In this role, Mr. Goodgame oversaw the fundamental business of the company – buying and selling

cars.  Mr. Goodgame had no involvement with the warehouse lenders referenced in the Indictment, nor was it part of his job to have any such interactions.  Despite this, the Indictment alleges, with no factual basis, that from at least 2018 through September 2025, Mr.  Chu, Mr. Goodgame, and others operated the company through a "systemic fraud."  ECF No. 2 ("Indictment") ¶ 2.

Critically, the government's investigation was underway even before Tricolor filed for bankruptcy on September 10, 2025.  The government interviewed former Tricolor employees Ameryn Seibold and Jerome Kollar on September 6 and 16, 2025.  As stated above, Kollar and Seibold were the Chief Financial Officer and Senior Director of Finance, respectively, with chief responsibility for the financial reporting to the lenders at the crux of this case.  More specifically, Mr. Seibold was directly responsible for managing the "borrowing base" reports for Tricolor – the reports generated internally within the Finance department to determine ostensibly which loans could be pledged to which warehouse lenders under the various lending criteria associated with each lending portfolio.  Kollar and Seibold immediately began cooperating, and those initial interviews seem to have formatively shaped the Government's investigation, including specifically its focus on Mr. Chu and Mr. Goodgame.

From the start, however, Kollar and Seibold both shared material exculpatory information concerning Mr. Goodgame.  Kollar, for instance, stated in that September 16, 2025 interview that during an August 2025 where Kollar was walking through the extent of the double pledging, Mr. Goodgame said, "If we knew about this sooner, then we could have done something about it."  Seibold similarly disclosed on September 6, 2025 that he spoke with Mr. Goodgame on an unknown date about the "collateral misrepresentations" and was told that Mr. Seibold had "no liability" for the misrepresentations.  *See* Exhibit 1 - Spencer Declaration at Exhibit C.

4

The Government relied upon this selective information from Kollar and Seibold to obtain broad warrants for Mr. Goodgame's home and person. *See* Exhibit A to Exhibit 1 (USAO_01_00000001-00000083, the "Search Warrants"). The Search Warrants and their included affidavits likewise authorized broad seizure or copying of electronic devices reasonably believed to belong to Mr. Goodgame. *Id.* at -025–45. Although the Search Warrants expressly relied on the information provided by Kollar and Seibold during their interviews by the government, CITE, they do not disclose any of the exculpatory information later contained in the government's *Brady* disclosures. Nor do they disclose (1) that Kollar and Seibold had both destroyed evidence that inculpated them—and likely exculpated Mr. Goodgame—during the course of the government's investigation, or (2) that Kollar had a history of dishonest behavior, including being accused of perpetrating a financial fraud at a prior employer, leading to its bankruptcy. *See* Spencer Declaration (Ex. 1) at Exhibit C; *see also* Schwartz Declaration attached to Mr. Chu's Omnibus motion (detailing prior fraud by Mr. Kollar).

The government then empaneled a grand jury, which began issuing grand jury subpoenas no later than October 2025. *See* Spencer Declaration (Ex. 1) at Exhibit C. Between October 20 and November 17, 2025, the government interviewed at least six additional high-ranking Tricolor employees and issued grand jury subpoenas or otherwise attempted to contact several others. *Id.* In December 2025, the government interviewed another Tricolor executive and representatives of three lenders. *Id.*

On or about December 16, 2025, Kollar and Seibold pleaded guilty, pursuant to cooperation agreements, to multiple felonies, including bank fraud, wire fraud affecting a financial institution, false statements to a financial institution, conspiracy to commit securities fraud, and destruction of records, among others. *See United States v. Kollar*, No. 25 Cr. 584 (S.D.N.Y.);

5

*United States v. Seibold*, No. 25 Cr. 585 (S.D.N.Y.).  Kollar and Seibold are expected to serve as central witnesses at trial.

### B.      The Indictment

The day after Kollar and Seibold pleaded guilty, the government unsealed the four-count indictment charging Mr. Chu and David Goodgame with (1) conspiracy to commit bank fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349 (Count Two); (2) bank fraud, in violation of 18 U.S.C. § 1344 (Count Three); and (3) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343 (Count Four).  *See* Indictment ¶¶ 29–36.  Although the Government included Mr. Goodgame in the first twenty-five paragraphs of the Indictment under Count One, Mr. Chu alone was charged under 18 U.S.C. § 225 with organizing, managing, or supervising a continuing financial crimes enterprise (Count One).  *See id*. ¶¶ 26–28.

In using a lengthy "speaking" indictment purporting to detail a fraud that spanned almost a decade, from 2018 until Tricolor's demise in 2025, the Government provides surprisingly little detail on its allegations against Mr. Goodgame..

Paragraphs 1-3 and 9 of the Indictment give the Government's overview of the alleged fraud in general terms, while paragraphs 4-8 describe Tricolor's business model and relationship with lenders.  Paragraph 10 details alleged instructions from Mr. Chu to Mr. Kollar, and then paragraphs 11-14 allege a smattering of communications between Mr. Chu and Kollar, between 2021 and 2023.   Paragraph 15 references short responses – a crying face emoji and the abbreviation "LOL" – from Goodgame as evidence of Goodgame's involvement in and understanding of the fraud perpetuated by Mr. Kollar and Mr. Seibold.  Likewise, paragraph 16 contains a single alleged statement attributed to Mr. Seibold, saying that Mr. Goodgame "reassured Seibold and Seibold would continue."  The only other statement in paragraphs 16-25 that pertains to Goodgame is an allegation that Mr. Chu proposed that Mr. Goodgame should use artificial

6

intelligence tools *after* the fraud was discovered to search for analogous situations to the fraud unfolding before them from Mr. Kollar and Mr. Seibold.

### C.    Less than Five Months Before Trial, Discovery is Far From Complete

Trial in this case is currently scheduled to begin October 19, 2026. However, the Government's investigation is ongoing and discovery is far from complete with no timetable for substantial completion. While the Government's review is understandably time-consuming given the millions of documents involved in the review, it seems unlikely that the Government will complete this review and production in time to timely produce these documents to Mr. Goodgame before trial, which will drastically affect Mr. Goodgame's ability to prepare his defense. Entire categories of documents – such as materials seized from Mr. Chu's residence and person in September, and Mr. Goodgame's cell phone – await a responsiveness review by the Government.

To date, the government's production of discovery under Federal Rule of Criminal Procedure 16 remains ongoing and incomplete. On January 12, 2026, the parties jointly submitted, and the Court entered, a stipulated protective order governing discovery materials produced under Rule 16, 18 U.S.C. § 3500, and the government's disclosure obligations under *Brady* and *Giglio*. ECF No. 22. Since then, the government has produced over one million documents, as well as the full images of 10 employee laptops from Tricolor and, as to Mr. Chu, full extractions of 10 of Mr. Chu's electronic devices seized by search warrant and the full reports of Mr. Chu's iCloud accounts. In total, these imaged devices and accounts constitute an additional approximately 12.21 terabytes of data—on top of the million-plus documents.

But despite turning over this enormous quantity of data, the government's Rule 16 obligations are far from being met.[1] To date, the government continues to produce voluminous

---

[1]    On May 11, 2026, consistent with the requirements of Local Rule 16.1, Mr. Chu served the government with a letter demanding (1) the prompt completion of Rule 16 discovery, (2)

discovery.  With the last couple of weeks, and likely in a futile attempt to show progress in document production in advance of the Defendants' pre-trial motion deadline of May 20, 2026, the Government produced Rule 16 materials on May 8, 2026 and May 19, 2026.  CITE TO LETTER   The Government's May 8, 2026 production alone —which had nothing to do with the devices seized from Mr. Chu—contained over 107,000 new documents.  *See* Spencer Declaration (Ex. 1) at Paragraph 10..  Analysis of the May  19, 2026 production, which purports to relate to some but not all of Mr. Chu's seized devices, remains ongoing but appears to contain at least 168,413 pages of information based upon the Bates range provided.  More concerningly, the government has told the defense that there is no deadline in sight for the completion of discovery from grand jury subpoenas.  *Id.*.  Despite the return dates on those subpoenas, the government has apparently not taken any steps to enforce the grand jury's deadlines, let alone moved to compel production.  It is instead accepting ongoing, rolling productions with no identified end dates. Spencer Declaration (Ex.1) at Paragraphs 16-20.  The defense has requested that the government follow up with producing parties in order to communicate to the defense the timeframe for additional production, but the government has declined even to do that.  *Id.*

Of greater concern because it is entirely within the government's control, the government has not completed its responsiveness reviews of the data on the majority of the devices and accounts as required by the Search Warrants.  The government has produced only partial responsive sets from the iCloud accounts, and a responsive set from Mr. Chu's MacBook.  *See*

---

undisclosed *Brady* material to the extent any exists, (3) a bill of particulars with respect to the allegations unsupported by discovery (described further below), and (4) the discharge of the grand jury given the pending Indictment and the government's continued indecision in bringing a superseding indictment.  On May 13, 2026, the government served a responsive letter (Ex. E to Exhibit 1, the "May 13 Letter"), and the parties subsequently conferred by email and videoconference. Spencer Declaration, Ex. 1, at paragraphs 16-20.

Spencer Declaration at Paragraph 10.  The government has indicated that it is "processing for production" additional responsive sets from certain devices, , but even as to those devices, the government has qualified that this review is ongoing, additional responsive sets may be produced, and that there is no estimated date of completion.  Spencer Declaration (Ex. 1) at Paragraphs 16-20.  And for certain other devices from Mr. Chu—and this does *not* include the devices that the government told the Court at the March conference it couldn't access and was trying to "crack,"— the government has not even *begun* its responsiveness review and/or has not produced *any* responsive data.  *Id.*  Likewise, the government has produced no responsive data from the cellphone seized from Mr. Goodgame, nor has it produced to Mr. Chu the complete image of Mr. Goodgame's device.  *Id.*  That is, Mr. Chu has received absolutely no discovery from Mr. Goodgame's device. *Id.*

The scant volume of responsive material produced to date, moreover, underscores how critical that review is.  For instance, the MacBook contains 38.3 GB of data but the government has only identified 133 responsive documents from both the MacBook and dchu@tricolor.com iCloud account.  *See*  Spencer Declaration (Ex. 1) at Paragraph 10.  Given the yawning gap between the full images of the seized devices and the limited number of responsive documents produced to date, the full extractions are poor substitutes for the production of the actual Rule 16 material on the devices—and the delay in competing its responsiveness review and producing that material is causing the defense to waste a tremendous amount of time, effort, and resources scouring ultimately irrelevant material with a trial date fast approaching.

Beyond these major deficiencies, the defense has also not yet received substantial additional discovery, including documents produced initially to the Securities and Exchange Commission, and which the government has agreed to produce.  Spencer Declaration (Ex. 1) at

paragraph 13.  While the parties may disagree on whether this is Rule 16 material, the fact is that the government *offered* to obtain and produce it, and the defense asked for it well over a month ago (on April 8), and still nothing has been produced.  *Id.*  And while Mr. Chu and Mr. Goodgame attempted to make as narrow, targeted requests as possible from this universe of documents, we still expect the additional discovery to include at least 100,000 additional documents.  Spencer Declaration at Paragraph 20.

The government's inability to conclude discovery sufficiently in advance of trial is problematic on at least two fronts.  First, the defense cannot possibly adequately prepare for trial on the current schedule under these circumstances, where not only is there no deadline for the production of Rule 16 discovery, but there is no projected end in sight.  Second, and perhaps more disturbing given the charges here, Mr. Goodgame has yet to receive any document discovery substantiating many of the core allegations contained in the Indictment.

Given the disconnect between the Indictment's allegations and the discovery produced to date, Mr. Chu and Mr. Goodgame have met and conferred with the government regarding discovery that has *not* been produced that the defense believes is necessary to defend against the charges filed.  This discovery includes, for instance, Kollar's archived emails, as well as discovery from the data system that generated the borrowing base reports that are the center of this case.  Spencer Declaration (Ex. 1) at Paragraphs 16-20.[2]

### D.    The Government's Ongoing Grand Jury Investigation

Perhaps because the government is aware that its evidence does not support the charges against Mr. Chu, the government is continuing to investigate through grand jury process.  The

---

[2]    The government has produced only six documents containing data derived directly from Tricolor's dealer management system.  *Id.*  These documents do not enable Mr. Chu to access the entire data set or discern which Tricolor employees manipulated the data therein—information fundamental to understanding and meeting the government's allegations.

defense has inquired about, and the government has declined to provide, any further information about such a superseder, including whether additional defendants may be charged or whether additional conduct may be implicated. *See, e.g.*, Ex. E to Exhibit 1 (May 13 Letter) at 3, 4. Meanwhile, the government has continued to use grand jury process to attempt to collect evidence relevant to the crimes already charged, including as recently as April 13, 2026. Spencer Declaration at Paragraph 5 and Exhibit B.

## **ARGUMENT**

Just months before Mr. Chu and Mr. Goodgame are set to go to trial, they are faced with an Indictment that fails to sufficiently put them on notice of the charges against them; the impending prospect of a superseding indictment that may add other unknown charges, conduct, and defendants; and they have been deprived of the timely production of the evidence against them, including evidence that was obtained based upon a misleading presentation to the magistrate, and which has been in the government's possession for many, many months but which remains unreviewed—all while the government continues to investigate to shore up its case.

Mr. Goodgame should be provided with a robust bill of particulars that puts him on fair notice of the charges against him, and the Government should be required to complete its production of Rule 16 material by a date certain, sufficiently in advance of trial. Evidence and seizures derived from—or seized in contravention of—the incomplete and misleading Search and Seizure Warrant Affidavits should be suppressed. Likewise, if the charges are not dismissed outright, the Court should order production of the grand jury record so that the defense can determine whether material exculpatory information was similarly withheld from the grand jury, and whether it was properly instructed.

11

A.      **Legal Standards**

1.      **Bill of Particulars**

Federal Rule of Criminal Procedure 7(f) provides that a court may direct the government to file a bill of particulars.  A bill of particulars is meant to enable the defendant to prepare for trial, prevent surprise, and allow him to interpose a plea of double jeopardy in a subsequent prosecution.  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

While "the decision to grant or deny a bill of particulars is within the sound discretion of the district court," *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), a defendant is entitled to a bill of particulars "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Siddiqi*, 2007 WL 549420, at *2 (S.D.N.Y. Feb. 21, 2007) (internal quotation marks omitted).  These principles are to be "applied with some care" when the government charges criminal offenses under broad statutes, because where the prosecution has "wide latitude" to "frame a charge," there is "an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."  *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (discussing RICO); *United States v. Hennessy*, 1993 WL 137766, at *3 (S.D.N.Y. Apr. 23, 1993) (requiring bill of particulars to identify victims of each allegedly unlawful act taken in furtherance of conspiracy); *see also United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) ("The indictment . . . must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.").

Discovery, even where voluminous, does not fulfill or replace the requirement of the indictment providing adequate notice.  "[T]he Second Circuit has made clear that the Government does 'not fulfill its obligations merely by providing mountains of documents to defense counsel

12

who were left unguided' as to the nature of the charges pending." *United States v. Reddy*, 190 F. Supp. 2d 558, 565 (S.D.N.Y. 2002) (quoting *Bortnovsky*, 820 F.2d at 575).  To the contrary, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *Bin Laden*, 92 F. Supp. 2d at 234.  "[I]f necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories." *Reddy*, 190 F. Supp. 2d at 565; *see also Bin Laden*, 92 F. Supp. 2d at 237 ("we do not believe that because the Government might be unable to provide a complete response to a Defendant's request for information, it should therefore not provide any information at all.").

## II.    MOTION FOR BILL OF PARTICULARS ON COUNTS TWO, THREE, AND FOUR[3]

As set out in Mr. Goodgame's Motion for a Bill of Particulars, Mr. Goodgame is entitled to a bill of particulars on Counts Two, Three, and Four.  These charges—bank fraud, wire fraud affecting a financial institution, and conspiracy to commit the same – are woefully short on detail. A bill of particulars is necessary to clarify Mr. Goodgame's alleged role and participation in the Indictment's sweeping conspiracy and years-long fraudulent conduct.  The allegations on these counts fail to provide sufficient notice of the conduct alleged to enable Mr. Goodgame to prepare for trial.

### A.    The Government Must Particularize Count Two.

Count Two alleges conspiracy to commit bank fraud and wire fraud affecting a financial institution.  *See* Indictment ¶¶ 29–32.  A conspiracy charge requires that the defendant "agreed

---

[3]    Mr. Goodgame expressly joins in and incorporates by reference the arguments made by Mr. Chu in his motion for a bill of particulars, and any other arguments in Mr. Chu's motion relevant to Mr. Goodgame.

with another" to commit an underlying substantive offense "and knowingly engaged in the conspiracy with the intent to commit that offense." *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024). Conspiracy to commit fraud requires specific intent. *United States v. Hussain*, 785 F. Supp. 3d 9, 13 (D. Vt. 2025) (citing *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)).

Here, for the reasons described above, the Indictment fails to allege how Mr. Goodgame "engaged in the conspiracy", his alleged involvement with the borrowing base reports, the lenders which he interacted with, or even just how Mr. Goodgame intended to commit fraud. The Indictment provides no specific intent by Mr. Goodgame, and selectively references communications made by Mr. Seibold without context and without acknowledging exculpatory statements that directly contradict the Government's position on these communications.

"Additionally, it is a long-standing principle of this Court's law of conspiracy that '[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it.'" *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (quoting *United States v. Peoni,* 100 F.2d 401, 403 (2d Cir.1938)). For example, in *McDermott*, the court reversed a conviction for conspiracy to commit insider trading where the defendant had no knowledge that the information he passed to one person was then passed to several others. *Id.* at 137–38.

In this case, the Indictment fails to connect Mr. Goodgame's response of a crying face emoji or simply, "LOL" with Mr. Seibold and Mr. Kollar's continuing fraud. The Indictment alleges that Mr. Goodgame repeatedly reassured Mr. Seibold, but offers no detail on what that reassurance was or how it was connected to Mr. Seibold continuing to commit fraud.

14

Therefore, the conspiracy charge is insufficiently pled.  The government should be required to state in a bill of particulars, as it did in *United States v. Mermelstein*, 487 F. Supp. 2d 242, 250–51 (E.D.N.Y. 2007), (1) the time frame of the scheme, (2) the scheme's victims, (3) the perpetrators of the scheme, (4) the place where the scheme was perpetrated, (5) the purpose of the scheme, and "most significantly" (6) the means by which the scheme was carried out.  In addition, to the extent that the conspiracy charged in Count Two is different than the enterprise charged in Count One, the government must be required to explain how.

### B.    The Government Must Particularize Counts Three and Four.

Given the Government's scant allegations as to how Mr. Goodgame participated in the alleged fraud, a bill of particulars is necessary on the substantive fraud counts, as well.  Like the conspiracy charge, the bank fraud and wire fraud charges require specific intent.  *See, e.g.*, *United States v. Priolo*, 812 F. Supp. 3d 250, 264 (E.D.N.Y. 2025).  In addition, where the government charges a continuing offense, as it has in Counts Three and Four (*see United States v. Teman*, 465 F. Supp. 3d 277, 311–15 (S.D.N.Y. 2020), *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023)), it must identify each occurrence that constitutes part of the continuing offense and thereby tolled the statute of limitations.  *See United States v. Pontz*, 132 F.4th 10, 25 (1st Cir. 2025) ("an overbroad application of the continuing-offense doctrine would undermine congressional policy to 'protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.'") (quoting *Toussie v. United States*, 397 U.S. 112, 114–15 (1970)); *United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999) ("for a conspiracy offense, the statute of limitations would not run from the time of the first overt acts, but instead would run from the occurrence of the last act in furtherance.").  Here, the Indictment contains no facts at all as to whole years supposedly part of the fraud, and only brief, tenuous allegations relating to others.

15

In Count Three—bank fraud—the Indictment alleges a wide scope of potentially fraudulent misrepresentations, which may have included "Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral . . . ." *See* Indictment ¶¶ 34.  Count Four—wire fraud affecting a financial institution—is similarly vague.  The government should be required to state each instance of fraud on a particular lender, the manner in which the fraud was committed, and Mr. Goodgame's particular connection to the fraud.  Courts "routinely award" bills of particulars identifying each false statement the government may attempt to prove at trial.  *United States v. Lino*, 2001 WL 8356, at *6 (S.D.N.Y. Jan. 2, 2001) (collecting cases).  This Court should order similar relief here.  Mr. Goodgame has set out the particulars that he would like addressed in his Motion associated with this memorandum.

## III.    MOTION TO SUPPRESS EVIDENCE, OR FOR A *FRANKS* HEARING

Mr. Goodgame joins in Mr. Chu's request for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1979), to determine whether evidence seized pursuant to the warrants issued for Mr. Goodgame's personal cell phone; as well as Mr. Chu's iCloud accounts, personal devices, residence, and bank account, should be suppressed.  The Warrant Affidavits—particularly to the extent they purport to inculpate Mr. Goodgame or provide probable cause to believe that Mr. Goodgame's devices contain evidence of criminal activity—rely extensively on the government's two cooperating witnesses, Kollar and Seibold.  But the Warrant Affidavits omitted material, exculpatory information that the government possessed at the time, including information from the cooperators' interviews (later revealed through a *Brady* disclosure) as well as information about Kollar's past involvement in fraudulent activity.  Those omissions were not harmless; they were the basis for the government's showing of probable cause.

16

### A.    Legal Standard Under *Franks*

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978).  The Fourth Amendment "would be 'reduced to a nullity if a police officer was able to remain confident that the ploy was worthwhile.'" *United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993) (quoting *Franks*, 438 U.S. at 168).  As such, the law "permits a defendant to challenge the truthfulness of factual statements made" in an affidavit supporting a search warrant application, "and thereby undermine the validity of the warrant and the resulting search and seizure." *United States v. Mandell*, 752. F.3d 544, 551–52 (2d Cir. 2014) (citing *Franks*, 438 U.S. at 155-56).  *Franks* likewise permits a defendant to challenge the omission of material information from a warrant affidavit.  *See United States v. Rajaratnam,* No. 09-cr-1184 (RJH), 2010 WL 4867402, at *7-8 (S.D.N.Y. Nov. 24, 2010).

A defendant is entitled to a *Franks* hearing upon a "substantial preliminary showing" that (1) the affidavit contained intentional or reckless misrepresentations or omissions—*i.e.*, "deliberate falsehood or reckless disregard for the truth," and (2) the misstatements were material—*i.e.*, "necessary to the judge's probable cause finding." *United States v. Nejad*, 436 F. Supp. 3d 707, 718–19 (S.D.N.Y. 2020) (emphasis omitted) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)).  "[T]he Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56.  Material omissions "are governed by the same rules." *United States v. Ferguson*, 758 F. 2d 843, 848 (2d Cir. 1985).

### B.    The Warrant Affidavits Recklessly Omitted Known Material, Exculpatory Information.

The Search Warrant Affidavits heavily relied on summaries of interviews of two cooperating witnesses—Kollar and Seibold—to establish probable cause that Mr. Goodgame

knowingly participated in and directed the alleged scheme. But the affidavits did not present those interviews fairly; they omitted material qualifications and exculpatory facts that the government possessed *before* the warrant applications were submitted.

To establish both intentional and reckless falsehoods, a defendant must show that "the misstatement or omission [was intended] to mislead the judicial officer into approving the requested warrant." *United States v. Vilar,* 2007 WL 1075041, at *25 (S.D.N.Y. Apr. 4, 2007). When an affiant makes statements that ignore or disregard the facts as he knew them, or which he seriously doubted to be true, the "reckless disregard for the truth" standard is met. *Rivera v. United States,* 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("If [the affiant] made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would show reckless disregard for the truth."), *aff'd in part, vacated in part,* 928 F.2d 592 (2d Cir. 1991); *Vilar,* 2007 WL 1075041, at *26 ("[O]ne 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations.").

Similarly, an omission is made with reckless disregard for the truth when "'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *United States v. Perez,* 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (quoting *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000)). "[W]here the omitted information was 'clearly critical' to the probable cause determination," recklessness can be inferred. *Id.  See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 698, 717 (S.D.N.Y. 2013) (granting motion to suppress in part where warrant affidavit "omitted certain . . . information in order to create the impression that" the defendant was tied to the alleged criminal conduct "when, in actuality, [the defendant] had no knowledge" of the criminal activity taking place). Information tending to exculpate the target of a warrant, or that calls into question the veracity of the factual sources of information in a warrant affidavit, is necessarily the sort of

18

thing that "a judge would wish to know." Similarly, an omission is made with reckless disregard for the truth when "'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *United States v. Perez,* 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (quoting *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000)). "[W]here the omitted information was 'clearly critical' to the probable cause determination," recklessness can be inferred. *Id. See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 698, 717 (S.D.N.Y. 2013) (granting motion to suppress in part where warrant affidavit "omitted certain . . . information in order to create the impression that" the defendant was tied to the alleged criminal conduct "when, in actuality, [the defendant] had no knowledge" of the criminal activity taking place). Information tending to exculpate the target of a warrant, or that calls into question the veracity of the factual sources of information in a warrant affidavit, is necessarily the sort of thing that "a judge would wish to know." *See Perez*, 247 F. Supp. at 474.

Here, the Search Warrant Affidavits selectively summarized the Kollar and Seibold interviews to create the appearance of direct knowledge and intentional participation by Mr. Goodgame, while recklessly omitting those witnesses' statements that contradicted that narrative.

### 1.    Reckless Omissions from the Kollar Interview

The Search Warrant Affidavits present Kollar as supplying direct inculpatory evidence that Mr. Goodgame knew about and directed the alleged conduct. For example:

- "Kollar further explained, in sum and substance, that while Kollar and Seibold executed the lending misrepresentation scheme, other executives at Tricolor knew of the misrepresentations, including Chu and Goodgame." Ex. 1 at Paragraph 7 and Exhibit C.

However, what the Affidavits failed to tell the issuing judges is critical. The Affidavits omit exculpatory statements Kollar made during his September 16, 2025 interview, which the government cannot dispute it possessed before the Search Warrants were sworn on December 16,

19

2025.  *See* Ex. 1 at Exhibit C  (*Brady* Letter), p. 4.  Most egregiously, Kollar stated in that September 16, 2025 interview that during an August 2025 call, during which "Kollar was walking through the extent of the double-pledging," Mr. Chu "seemed to be shocked at the amount, the size of what it had grown to be" and Mr. Goodgame "said that if we knew about this sooner then we could have done something about it."  *Id*.

In short, the Search Warrants asked a magistrate judge to credit Kollar's statements to establish Mr. Goodgame's knowledge and direction, while omitting information that materially changes that assessment.  That is precisely the kind of omission that supports a *Franks* hearing.  *See e.g.*, *Lahey*, 967 F. Supp. 2d at 723–30.

### 2.    Reckless Omissions Concerning Kollar's History of Fraud

The Search Warrants' twice-reliance on Kollar is especially problematic because they also omit critical information about Kollar's credibility as a witness: this is the *second time* that a company of which Kollar was CFO was pushed into bankruptcy after his misconduct was revealed.[4]

In 2017, Kollar was sued by the court-appointed Chapter 7 trustee of Mach Speed Holdings, LLC and its affiliates—a consumer electronics, audio, and recreational products company over which Kollar was CFO.  The trustee alleged that Kollar and other officers of the debtors orchestrated a multi-step scheme to siphon value from the company, including through improper loan practices and related-party transactions.  The trustee's complaint alleges a variety of claims, including breach of fiduciary duty and engaging in fraudulent transfers, and expressly

---

[4] See Schwartz Declaration, as attached to Daniel Chu's Omnibus Motion in Support of Chu's Initial Pretrial Motions, at paragraph 34.

alleges that Kollar and other defendants engaged in "malicious, willful, and fraudulent conduct and/or gross negligence."[5]

The fact that Kollar had a history of engaging in allegedly fraudulent transactions—including fraudulent lending transactions—as CFO of another company, which likewise ended up in bankruptcy, is highly relevant to his credibility as someone upon whom the Search Warrants rely. It is certainly something that a "judge would wish to know," *Perez,* 247 F. Supp. 2d at 474, particularly where the Search Warrants relied so heavily on information from Kollar to attempt to implicate Mr. Chu and Mr. Goodgame.

### C.    The Omissions Were Material to Probable Cause.

Having established that the affiants omitted material information in reckless disregard for the truth, the next step in the *Franks* inquiry is to establish that the omissions were material. *See United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

In assessing materiality, a court must decide whether "putting aside erroneous information there remains a residue of independent and lawful information sufficient to support probable cause," *United States v. Awadallah,* 349 F.3d 42, 65 (2d Cir. 2003), or, in the case of material omissions, whether inclusion of the omitted truths would support probable cause, *Rajaratnam,* 719 F.3d at 146. When the remaining allegations are "insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 156. In that regard, probable cause to support a search warrant exists if the totality of circumstances "raise a fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). If, as is often the case, probable cause is putatively established by information

---

[5]    *Id.* The complaint against Kollar was subsequently removed to federal court in light of the Mach Speed bankruptcy.

obtained from an informant, courts may consider both the reliability of the informant and the reliability of the information provided by the informant. *See id.* at 230 (holding that while an informant's "veracity" is "highly relevant" to the existence of probable cause, it is only one part of the larger common sense determination).

The Search Warrants depend on the proposition that Mr. Goodgame knew about and directed the alleged lending misrepresentations. But the *Brady* Letter materially undercuts that proposition. Kollar's account that Mr. Goodgame statement "would have done something about" the fraud "if we had known" about it, made in August 2025 is incompatible with the narrative of Mr. Goodgame's purported knowledge or or participation in the alleged fraud. Ex. 1 at Ex. C (*Brady* Letter) at 4. And of course this double reliance on Kollar to try to pin the fraud on Mr. Goodgame is particularly problematic in light of the Search Warrants' omissions about Kollar's history of similar fraudulent conduct.

With those truths inserted, the affidavits contained in the Search Warrants show (at most) that a single cooperating insider, facing substantial sentencing exposure and with a history of himself engaging in similar fraudulent conduct, offered a qualified account to try to inculpate his superior in the corporate organizational chart. That is not enough to establish probable cause for the sweeping searches authorized here.

### D. The Court Should Order Disclosure of Unredacted FBI 302s and Underlying Notes of the Kollar and Seibold Interviews

Given the indisputably critical significance of the anticipated testimony of Kollar and Seibold at trial, and the exculpatory statements attributed to them in the *Brady* Letter, Mr. Goodgame respectfully requests that the Court order the government to immediately produce the unredacted interview notes and the FBI interview reports (the "FBI 302s") and the underlying witness notes for the interviews identified in the *Brady* Letter, and any subsequent interviews of

22

Kollar and Seibold.  *See* Ex. 1 at Exhibit C (*Brady* Letter) at 4–6 (describing meetings with Kollar on September 16 and November 20, 2025, and with Seibold on September 6, 2025).  Because *Franks* asks what information the government possessed and knew at the time it sought judicial authorization, the most reliable record of that knowledge includes the contemporaneous 302s and underlying notes.  *See, e.g.*, *United States v. Holihan*, 236 F. Supp. 2d 255, 263-64 (W.D.N.Y. 2002) (holding that, even though requested FBI 302 Reports were not presently discoverable under the *Jencks* Act, they contain information that is "material to the preparation of the defense given that it may demonstrate how [bank employees] became aware of the alleged embezzlement" and "may also aid Defendant with her defense that she was set up by co-employees," and ordering transposition of specific facts in the reports).

Mr. Goodgame should not be forced to litigate reckless omissions and materiality based on the government's paraphrasing and summaries of what occurred in these pivotal interviews.  In the alternative, Mr. Goodgame requests that the Court conduct *in camera* review of the unredacted materials and order production of all portions that bear on the omissions identified in this Motion, on Mr. Goodgame's alleged knowledge and intent, and on the credibility and scope of knowledge of Kollar and Seibold.

## IV.    MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA* REVIEW

For similar reasons, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), Mr. Goodgame respectfully moves for disclosure of the grand jury record—specifically, (i) the transcripts of all grand jury proceedings, and (ii) all legal instructions provided to the grand jury— or, at minimum, *in camera* review of those materials in the first instance.

23

A.      **The Government Is Required to Present Exculpatory Evidence In the Grand Jury If It Undermines Probable Cause**

As demonstrated in the *Franks* Motion, the government's theory of Mr. Goodgame's knowledge and intent depends entirely on two cooperating witnesses: Kollar and Seibold. But the government's sworn Search Warrant affidavits omitted material portions of these witnesses' pre-indictment interviews that undermine and contradict that narrative. Those omissions—especially when coupled with the Indictment's speaking allegations that plainly come from information provided by Kollar and Seibold —raise serious concerns that the grand jury's probable cause determination may likewise have rested on the same selective and incomplete presentation, rather than a fair account of what the government already knew when it sought to indict.

While the Supreme Court has found that prosecutors have no "legal obligation to present exculpatory evidence" to a grand jury, *United States v. Williams*, 504 U.S. 36, 52 (1992), dismissal may still be warranted if "the prosecutor's conduct" before the grand jury "amount[ed] to a knowing or reckless misleading of the grand jury as to an essential fact," *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (quoting *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989)). A prosecutor who intentionally or recklessly misleads the grand jury "impair[s] . . . the grand jury's independent role." *United States v. Vetere*, 663 F. Supp. 381, 386 (S.D.N.Y. 1987) (quotation omitted).

The Department of Justice's own policy reinforces that principle. When a prosecutor is "personally aware of substantial evidence that directly negates the guilt of a subject of the investigation," the prosecutor "must present or otherwise disclose such evidence to the grand jury before seeking an indictment." U.S. Dep't of Justice, Justice Manual § 9-11.233 (Presentation of Exculpatory Evidence) ("While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of

24

Professional Responsibility for review.").  The ABA Standards for Criminal Justice likewise mandate the government's responsibility:  "No prosecutor should knowingly fail to disclose to the grand jury evidence which tends to negate guilt or mitigate the offense."  American Bar Association, Standards for Criminal Justice, Prosecution Function (3d ed. 1993), Standard 3-3.6(b).  Courts have repeatedly recognized that such violations may warrant judicial scrutiny and dismissal, particularly where the failure to disclose exculpatory information may have affected the grand jury's probable cause determinations.  *See, e.g.*, *Vetere*, 663 F. Sup 381; *United States v. Estepa*, 471 F.2d 1132 (1972).

Here, nothing on the face of the Indictment indicates that the grand jury heard the full scope of Kollar's and Seibold's statements, including the exculpatory and qualifying information later disclosed in the *Brady* Letter.  Further, the Indictment was returned only months after the government obtained the Search Warrants, when it had obtained little third-party document discovery and had not begun to identify, let alone review, the vast majority of data it had seized.  Even now—less than five months before trial—the government's discovery remains ongoing with no projected end date for production.  That means the government likely went to the grand jury with an incomplete evidentiary record and appears to have rushed to charge the case based on early accounts from Kollar and Seibold.  Without the omissions later disclosed in the *Brady* Letter, and without meaningful documentary corroboration or other information that would have undermined the cooperating witnesses' accounts, there is a substantial basis to question whether the grand jury's probable cause determination was based on an incomplete and misleading presentation.

## B.  There Is a Particularized Need to Believe the Grand Jury May Have Been Misled.

Rule 6(e)(3)(E)(ii) permits disclosure of matters occurring before a grand jury, "at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the

indictment because of matters occurring before the grand jury." *Dennis v. United States*, 384 U.S. 855, 870 (1966).  Parties seeking such disclosure must show: (i) "that the material they seek is needed to avoid a possible injustice in another proceeding," (ii) "that the need for disclosure is greater than the need for continued secrecy," and (iii) "that their request is structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222; *see also United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (to obtain disclosure, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity").  This standard applies to both *in camera* review and disclosure to the parties of grand jury minutes.  *See United States v. Dunn*, 2005 WL 1705404, at *1 (S.D.N.Y. July 19, 2005).  Here, there is a particularized need for the grand jury record, including transcripts and instructions.

*First*, the government already distorted Kollar's and Seibold's witness evidence to secure the Search Warrants.  The Indictment was returned only months later, based on the same narrative. We can not know for certain whether the grand jury was misled by the same cooperating witnesses, or government agents who selectively summarized the cooperators' statements, without disclosure of the omitted *Brady* information.  But if, as it is reasonable to infer, the grand jury heard testimony consistent with the Search Warrant affidavits before it deliberated as to whether to indict Mr. Chu and Mr. Goodgame, then the grand jury proceedings are defective because they were based on misleading testimony.  *See United States v. Hogan*, 712 F. 2d 757–62 (2d Cir. 1983) ("Heavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof."); *see also, e.g.*, *United States v. Peralta*, 763 F. Supp. 14, 18–21 (S.D.N.Y. 1991) (dismissing indictment on supervisory grounds and holding that cumulative effect of inaccurate hearsay testimony and erroneous legal instructions warranted this relief even midtrial); *Vetere*, 663 F. Supp. at 383–87 (dismissing indictment even after trial jury returned guilty verdict where the hearsay testimony

26

presented in the grand jury "crossed line" in being presented specifically to "push a wavering grand jury over the edge"); *see also United States v. Basurto*, 497 F.2d 781, 787 (9th Cir. 1974) (reversing conviction where indictment was obtained in part on perjured testimony in front of grand jury).

For instance, Mr. Goodgame must be equipped to assess whether—like the magistrate judges by the Search Warrant affidavits—the grand jury was misled about the limits of Seibold's claimed knowledge.  Kollar's statement that Goodgame "would have done something" about the fraud "if we had known" seems to explicitly exculpate Mr. Goodgame and directly contradicts the handful of statements attributed to Mr. Seibold.  The grand jury "must not be 'misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed.'"  *United States v. Estepa*, 471 F.2d 1132, 1136 (2d. Cir. 1972) (dismissing indictment after finding that sole grand jury witness, a police officer with severely limited personal knowledge of a drug transaction, testified "at length and in detail" about events he had not seen or heard without any indication to the grand jury of the limits on his knowledge); *see also Hogan*, 712 F.2d at 757–62 ("[O]ur decision in [*Estepa*] indicates that extensive reliance on hearsay testimony is disfavored" and "the government prosecutor, in presenting hearsay evidence to the grand jury, must not deceive the jurors as to the quality of the testimony they hear").

*Second*, the lack of corroborating documents makes the grand jury record even more critical.  The government has produced massive volumes of data but identified only a small subset as responsive, and has not identified contemporaneous documentary evidence to substantiate its central allegations that Mr. Goodgame participated in the fraud.  For example, the Indictment's allegation that Mr. Goodgame "orchestrated" the "fraudulent double-pledging and collateral manipulation schemes," Indictment ¶ 3, is unsupported by any discovery identified to date. =Given

27

the lack of documentary or other evidence, there is a substantial risk that the grand jury's decision hinged on the narratives of cooperating witnesses.

Further, any documentary evidence that *does* exist was likely only explained to the grand jury by the cooperators themselves (almost certainly indirectly, via a government agent). For instance, the Indictment references a Teams exchange between Mr. Goodgame and Mr. Seibold in which Mr. Seibold states, "Hopefully after this securitization we can keep them a bit cleaner, lol" and then Mr. Goodgame responds with "Lol" leaves out that Mr. Seibold sent an animated GIF image to Mr. Goodgame that said "lol" (not that Mr. Seibold independently said Lol), and that Mr. Goodgame did not respond until almost thirty minutes later, saying, "Lol" in response to the GIF, not the comment about the securitization. Indictment ¶ 16. Without more, whether that message is inculpatory depends almost entirely on cooperating witness Seibold's interpretation and context—precisely the kind of testimony that must be evaluated for completeness and reliability.

*Third*, the cooperators' incentives heighten the danger of a misleading presentation to the grand jury. Kollar and Seibold are not disinterested observers; they were senior insiders who pleaded guilty and agreed to cooperate. Their sentencing exposure provides powerful incentives to minimize their roles and instead blame Mr. Goodgame, particularly on issues of knowledge and intent. The *Franks* record already shows that when the government sought judicial authorization for sweeping searches, it presented these cooperators' accounts in a manner that emphasized inculpatory interpretations while withholding key limitations and qualifying facts. Their bias underscores the need for heightened scrutiny.

If anything, the likelihood that critical information about Kollar and Seibold's testimony was withheld from the grand jury is even more material than with respect to the Search Warrant Affidavits. While the Search Warrant Affidavits relied on the cooperators to establish probable

28

cause to believe that Mr. Goodgame's home, devices, and cloud storage accounts might have evidence of crime, the grand jury was asked to rely on those same cooperators to find probable cause to believe (among other things) that Mr. Goodgame committed bank fraud, wire fraud, or conspired to do so. The government's presumed failure to inform the grand jury of the information contained in its *Brady* disclosures, and concerning Kollar's prior fraud, necessarily tainted the Indictment.

> ### C. The Grand Jury Record Is Necessary to Assess the Integrity of the Probable Cause Determination.

For the reasons stated above, the unsealing of the grand jury transcripts is necessary to assess the grand jury's determination of probable cause. Mr. Goodgame recognizes the Court's responsibility to safeguard grand jury secrecy. *See* Fed. R. Crim. P. 6(e)(3)(E) (authorizing Court to structure disclosure "at a time, in a manner, and subject to any other conditions that it directs"); *see also In re Petition of Craig*, 131 F. 3d 99, 103 (2d Cir. 1997) (the court has the power to order grand jury disclosures in its "sound discretion under the special circumstances of each case"). However, given the novelty and lack of model jury instructions on the elements of the Section 225 charge, and the disconnect between the allegations in the Indictment and the elements of the offense, there are important questions regarding the grand jury's basis for finding probable cause on that offense, which the government has failed to answer.

The Court may, of course, impose appropriate limitations, authorize targeted redactions or conduct *in camera* review in the first instance. *See, e.g.*, *United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014). In the alternative, if the Court determines broader disclosure of the transcripts is unnecessary at this stage (it is not), Mr. Goodgame respectfully requests the disclosure of materials limited to Kollar and Seibold, and any other subjects bearing on Mr. Goodgame's alleged knowledge and intent.

The grand jury instructions are independently necessary to assess whether the grand jury applied a correct legal framework to the government's evidence.   Erroneous legal instructions can constitute such a ground, provided that there is "grave doubt that the decision to indict was free from such substantial influence" of the defect.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988).

Based on the inherently prejudicial impact of mis-instructing a grand jury, courts have ordered dismissal of an indictment based, at least in part, on erroneous or misleading legal instructions.  *See, e.g.*, *Peralta*, 763 F. Supp. at 19–21 (dismissing indictment where there was "grave doubt that the decision to indict was free from the substantial influence" of the prosecutor's "misleading statements of law" regarding constructive possession of a firearm, notwithstanding fact that the prosecutor had also read the statute to the grand jury); *Vetere*, 663 F. Supp. at 386–87 (dismissing indictment, even after a guilty verdict at trial, on grounds that the independent role of the grand jury was impaired based on the prosecutor's misleading "presentation both with respect to the facts and the law"); *United States v. Twersky*, 1994 WL 319367, at *4 (S.D.N.Y. June 29, 1994) (an indictment "will not be permitted to stand" if the prosecutor's instructions are "misleading due to mistakes or omissions" (internal quotation marks and citations omitted)).  At a minimum, *in camera* review of the grand jury instructions is warranted.  *See United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (ordering *in camera* review of grand jury instructions because a significant "change in the law" made it possible that "the grand jury did not receive the proper instructions"); *United States v. Ho*, 2009 WL 2591345, at *3–5 (D. Haw. Aug. 20, 2009) (inspecting grand jury instructions in camera because the prosecutor had made "on-the-record statements" reflecting a misunderstanding of a necessary element and, as a result, the court could not "rule out that the government did not properly instruct the grand jury").

Ensuring that the grand jury was not erroneously instructed is especially important here, where the government "is continuing to use grand jury subpoenas, because the grand jury continues to investigate." Ex. E to Exhibit 1 (May 13 Letter) at 6.

.

## CONCLUSION

For the foregoing reasons, Mr. Goodgame's motions should be granted in their entirety.

Dated:   May 20, 2026
         New York, New York

Respectfully Submitted,

Spencer and Associates

/s/ *Arnold A. Spencer*
Arnold A. Spencer
State Bar No. 00791709
arnold@aspencerlaw.com
Thomas Dan Cushing
State Bar No. 24056915
dan@aspencerlaw.com
5956 Sherry Ln., Suite 2000
Dallas, Texas 75225
Telephone: (214) 358-8500

*Counsel for David Goodgame*

## CERTIFICATE OF GOOD FAITH PURSUANT TO L. CRIM. R. 16.1

I hereby certify that on May 15, 2026, I conferred with counsel for the government in an effort in good faith to resolve by agreement the issues raised by this motion without the intervention of the Court and have been unable to reach agreement.

/s/ *Arnold A. Spencer*
Arnold A. Spencer

33