UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA,

25-cr-579 (PKC)

-against-

OPINION AND ORDER

DANIEL CHU,

Defendant.
---------------------------------------------------------x

CASTEL, Senior District Judge

Presently before the Court are several pretrial motions filed by defendant Daniel Chu. Chu moves (1) to dismiss Count One of the indictment against him, or alternatively, for a bill of particulars as to Count One, (2) for a bill of particulars for Counts Two through Eight, (3) for a Franks hearing in support of a motion to suppress the fruits of searches pursuant to warrants containing material omissions, (4) for the disclosure of grand jury materials, (5) to quash grand jury subpoenas and preclude certain evidence obtained through the grand jury process, and (6) to suppress certain evidence seized as beyond the scope of the applicable search warrant. For the reasons below, the motions are denied with the limited exception of Chu's request for a bill of particulars as to Counts Seven and Eight.

BACKGROUND

Daniel Chu is charged in a Superseding Indictment with systematic fraud in connection with the operation of Tricolor Holdings, LLC and affiliates ("Tricolor"). Chu was the Chief Executive Officer of Tricolor, which he founded to "provide[ ] subprime financing for

used cars, focusing specifically on Hispanic customers with limited or no credit history." (Superseding Indictment ¶ 4.) Tricolor employed over 1,500 people and had over $1 billion in revenue in 2023 and 2024. (Id.) At the time of its bankruptcy filing on September 10, 2025, it had over 60,000 auto loans outstanding. (Id.)

Tricolor relied on credit from lenders collateralized by car loan receivables and used cars. (Id. ¶ 5.) The company also securitized car loan receivables, which were sold to investors as bonds. (Id.) The gist of the principal allegations against Chu is that he, together with other senior executives of Tricolor, defrauded investors and lenders by double-pledging collateral and misrepresenting auto loans made to Tricolor customers to conceal that they were delinquent or ineligible under lenders' requirements. The indictment alleges that "[o]ver time, this series of fraudulent schemes had a profound effect on Tricolor, which obtained hundreds of millions of dollars in cash advances; on CHU, who used a portion of the funds to enrich himself; and on Tricolor's lenders, who provided over a billion dollars in funding based on Tricolor's fabricated data and false statements." (Id. ¶ 1.)

The original Indictment charged Chu with organizing a Continuing Financial Crimes Enterprise (Count One), an infrequently charged crime that carries a maximum term of imprisonment of life, a mandatory minimum of ten years, and a fine of up to $10,000,000. 18 U.S.C. § 225. It also charged him with Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution (Count Two), Bank Fraud (Count Three), and Wire Fraud Affecting a Financial Institution (Count Four). The Superseding Indictment[1] removes references to David Goodgame, the former Tricolor Chief Operating Officer who was originally charged as a co-defendant but who subsequently entered a guilty plea and adds additional counts charging

[1] References to the "indictment" are to the Superseding Indictment unless otherwise indicated.

Bank Fraud (Count Five), Wire Fraud Affecting a Financial Institution (Count Six), Conspiracy to Commit Securities Fraud (Count Seven), and Securities Fraud (Count Eight). With respect to Count One, the only substantive change in the Superseding Indictment is to add detail on the fraud perpetrated against investors in Tricolor's bonds. (Id. ¶ 17.)

DISCUSSION

I. Motion to Dismiss Count One

In 1990, Congress enacted the Continuing Financial Crimes Enterprise statute, codified at 18 U.S.C. § 225.[2] As Chu observes, section 225 is sometimes referred to as the "financial kingpin" statute and a violation thereof has been charged "only a handful of times anywhere." (ECF 46 at 23.)

The statute defines a "continuing financial crimes enterprise" as "a series of violations" of one or more enumerated criminal statutes, including bank fraud and wire fraud, both of which are charged in the indictment. 18 U.S.C. § 225(b). To violate the statute, a person must have "organize[d], manage[d], or supervise[d] a continuing financial crimes enterprise[,]" and the requisite "series of violations" must have been "committed by at least 4 persons acting in concert." Id. § 225(a)-(b). If the predicate crime is mail fraud or wire fraud, then it must have affected a financial institution. Id. § 225(b). In addition, the person must have received

[2] The statute provides in full as follows:
(a) Whoever—
(1) organizes, manages, or supervises a continuing financial crimes enterprise; and
(2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period,
shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.
(b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

"$5,000,000 or more in gross receipts from such enterprise during any 24-month period[.]" Id. § 225(a).

Count One of the indictment details the alleged enterprise in 29 paragraphs. It describes ten qualifying crimes as comprising the requisite "series of violations" and sets forth the time-period in which each of the ten violations were committed. The ten violations were acts of bank fraud and wire fraud intended to defraud a financial institution as defined in 18 U.S.C. § 20. (Id. ¶¶ 27–29.) The indictment ties each affected lender to each violation by numerical designation, e.g., "Lender-1."[3] (See id. ¶ 9.) It identifies by name three other individuals who participated in the commission of the violations, including Tricolor's Chief Operating Officer David Goodgame, Chief Financial Officer Jerome Kollar, and Senior Director of Finance Ameryn Seibold. It tracks the language of the statute in further alleging that Chu "knowingly organized, managed, and supervised a continuing financial crimes enterprise, in that [he] committed violations of [the bank fraud and wire fraud statutes], including violations one through ten set forth below, which violations were part of a series of violations of those statutes committed by at least four persons acting in concert, and from which the defendant received $5,000,000 and more in gross receipts from such enterprise during a 24-month period." (Id. ¶ 27.) Elsewhere, it alleges that "[d]uring the 24-month period from August 2023 through August 2025, Tricolor made more than $19.3 million in salary and bonus net cash payments to CHU's bank accounts[,]" including two payments totaling $6.25 million made within three weeks of Tricolor's bankruptcy filing. (Id. ¶ 26.)

[3] The government represents that it has informed Chu's counsel of the identity of the victim lenders. (ECF 83 at 16 n.2.)

Chu challenges the sufficiency of Count One of the indictment on the basis that it fails to "identify what the relevant enterprise is; who was a part of it; how it operated; how Mr. Chu supposedly directed it; or how he allegedly profited from it—all elements of the offense." (ECF 46 at 24.)

The Federal Rules of Criminal Procedure require an indictment to be "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Rule 7(c), Fed. R. Crim. P. The Rules permit the dismissal of a criminal indictment where the indictment "fail[s] to state an offense[.]" Rule 12(b)(3)(B)(v), Fed. R. Crim. P. "Since federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." United States v. Aleynikov, 676 F.3d 71, 75–76 (2d Cir. 2012) (quoting Dowling v. United States, 473 U.S. 207, 213 (1985)); United States v. Pirro, 212 F.3d 86, 91–92 (2d Cir. 2000). A court considering a motion to dismiss an indictment accepts the indictment's allegations as true and does not consider the sufficiency of the evidence that the government is likely to offer at trial. United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009).

Generally, "an indictment need 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Pirro, 212 F.3d at 92). A sufficient indictment must simply "contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend" and "enable[ ] [a defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). "An indictment . . . need not be perfect, and common sense and reason are

more important than technicalities." United States v. De La Pava, 268 F.3d 157, 162 (2d Cir. 2001).

The indictment identifies the continuing financial crimes enterprise in a manner that more than satisfies the requirements of Rule 7 by identifying ten violations comprising a "series of violations," the lender-victim for each, the type of credit agreement for each, and the dates when each occurred. It describes the frauds on lenders and investors in considerable detail. Chu is identified as the organizer, manager, or supervisor, and three other persons who committed the violations in concert with him are identified by name and position as senior officers of Tricolor.[4] There is no requirement that the enterprise be a group, entity, or association in fact.

In terms of Chu's assertion that he is deprived of knowing "how [the enterprise] operated; [and] how Mr. Chu supposedly directed it;" the indictment makes plain that the series of violations were committed through Tricolor, of which Chu was CEO. (ECF 46 at 24.) It alleges that individuals were "instructed" or "directed" by Chu, or acted "[a]t the direction of" Chu. (Superseding Indictment ¶¶ 1, 10, 12–15.) Paragraph 1, for example, alleges that "[a]t CHU's direction, multiple Tricolor executives repeatedly defrauded lenders using various fraudulent schemes, including 'double-pledging' collateral[.]" (Id. ¶ 1.) The indictment also contains more specific allegations, such as that in 2018, "DANIEL CHU, the defendant, instructed Kollar to pledge delinquent loans to the Lender-1 Credit Line." (Id. ¶ 10.) In context, it is sufficient, together with the other statutory allegations, to allege that Chu was the CEO of an entity that employed the three other identified senior executives who acted in concert with him to

[4] The language of the statute requires that at least four persons act in concert, i.e., the person who is the organizer, manager, or supervisor, and at least three others. See United States v. Harris, 79 F.3d 223, 230 (2d Cir. 1996) (quoting district court's instruction to the jury that the government must prove "that the defendant acted together with a total of at least three other persons").

commit the series of violations. The charges in the indictment are thus not "so general that they do not advise the defendant of the specifics acts of which he is accused." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (quoting United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987) (Brieant, J.), aff'd, 875 F.2d 857 (2d Cir. 1989)), abrogated on other grounds as recognized by United States v. Marcus, 628 F.3d 36 (2d Cir. 2010).

There is no support for the proposition that the indictment must provide an exhaustive list of those acting in concert with Chu. Section 225 has a similar "in concert with" requirement to the continuing criminal enterprise statute applicable to drug crimes, 21 U.S.C. § 848.[5] In one section 848 case, the district court did not require each individual acting in concert to be named in the indictment. See Monsanto v. United States, 348 F.3d 345, 346–47 (2d Cir. 2003) (citing unchallenged jury instructions that an element of a section 848 violation was "that [defendant] undertook to commit this series of violations in concert with five or more persons either named or unnamed in the Indictment"). Precedent also shows that "the government need not establish that the defendant acted in concert with each of the other five persons at the same time" under section 848. See United States v. Young, 745 F.2d 733, 747 (2d Cir. 1984).[6]

Chu is also incorrect in arguing that the indictment must explain exactly how he profited in the requisite amount during a 24-month period. The indictment tracks the statute in alleging that Chu "received $5,000,000 and more in gross receipts from such enterprise during a 24-month period." (Id. ¶ 27.) It also alleges that "during the 24-month period from August 2023

[5] The statute differs from section 225 in requiring the organization or supervision of "five or more other persons[.]" See 21 U.S.C. § 848(c)(2)(A).
[6] Chu initially states that "it is not necessarily [his] contention that each and every act in the 'series of violations' constituting the 'enterprise' [must] involve four or more persons acting in concert." (ECF 46 at 36.) He later claims that "the 'in concert' element in [section 848] is so facially different from Section 225 that the caselaw interpreting it is of no help." (ECF 118 at 12.) The Court agrees that caselaw under section 848 is not controlling but on the cited issues, it finds it to be useful and persuasive.

through August 2025, Tricolor made more than $19.3 million in salary and bonus net cash payments to CHU's bank accounts[,]" including $6.25 million at Chu's direction at a time when he knew that Tricolor was "definitely insolvent[.]" (Id. ¶ 26.)

The government must prove beyond a reasonable doubt that the "gross receipts" were received by Chu from the "enterprise," which the statute defines as the series of violations, even if the conduit for payment was Tricolor. Contrary to Chu's contention, gross receipts may take the form of salary or other compensation. At least one court interpreting section 225 has found that the government can rely on a defendant's compensation to show the requisite amount of gross receipts where the defendant's firm had been kept afloat by the charged offenses. See United States v. Gallant, 537 F.3d 1202 (10th Cir. 2008). The Tenth Circuit explained that each defendant "received over $6 million of payroll deposits and over $5 million of other payments from [their firm,]" which "would not have been able to make these payments" absent false bank record entries made in violation of 18 U.S.C. § 1005. Id. at 1232. "The false call reports thus constituted 'a continuing financial crimes enterprise' from which [defendants] each 'receive[d] $5,000,000 or more in gross receipts[.]'" Id. (quoting 18 U.S.C. § 225).

The Court concludes that Count One meets the standards in Rule 7(c), Fed. R. Crim. P., and sufficiently alleges the charge under section 225 of Title 18. The motion to dismiss Count One will be denied.

## II. Motion for A Bill of Particulars as to Each Count

In the alternative to the dismissal of Count One, Chu moves for a bill of particulars as to that count, as well as to all other counts.

Rule 7(f), Fed. R. Crim. P., "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). However, "[a] bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)). "[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." Id. (quoting Walsh, 194 F.3d at 47). Nor is a bill of particulars "a vehicle for defendants 'to preview the evidence or theory of the government's case' or to access information that is merely 'helpful.'" United States v. Tucker, 16-cr-91, 2017 WL 3610587, at *5 (S.D.N.Y. Mar. 1, 2017) (quoting United States v. English, 10-cr-431, 2011 WL 3366490, at *4 (S.D.N.Y. July 29, 2011) (McMahon, J.)), aff'd sub nom. United States v. Grote, 961 F.3d 105 (2d Cir. 2020).

At the outset, the Court notes the government's representation that it has "provided extensive text-searchable discovery organized with cover letters and indices" and will provide Chu with "trial exhibits, a witness list, and Jencks Act material a month in advance of trial, as the Court has ordered." (ECF 113 at 19.)

With respect to Count One, Chu is not entitled to learn the identity of individuals besides himself, Kollar, Goodgame, and Seibold who may have participated in the underlying violations. In the similar context of conspiracy cases, "[c]ourts have granted requests for bills of particulars identifying co-conspirators . . . where the number of defendants was large, where the

alleged conspiracy spanned long periods of time and where the alleged schemes were wide-ranging." United States v. Reddy, 190 F. Supp. 2d 558, 570 (S.D.N.Y. 2002) (Swain, J.). The government alleges a long-running scheme in the indictment, but there remains only one defendant, and the scheme was confined to the practices of one company in its dealings with lenders and investors.

Chu is also not entitled to learn "each specific action [the government] intends to rely on as evidence of [his] organization, management, or supervision of an underlying violation." (ECF 99 at 33.) "[T]he usual rules on bills of particulars need[ed] to be stretched" in United States v. Connolly, 16-cr-00370, 2017 WL 2537808, at *5–6 (S.D.N.Y. May 24, 2017) (McMahon, J.), because the government presented defendants charged with a scheme to manipulate LIBOR with discovery on "millions" of trades that the defense would need to "correlate[ ] with underlying data that [was] not easy to locate" to make the trading data complete and usable. The Court required the government to "particularize the crimes charged by identifying to the defense a finite universe of trades" but emphasized that this was not "the ordinary case[.]" Id. Chu does not explain why the evidence in this case rises to that level of complexity. There are only ten violations in the "series" with which Chu is charged in Count One.

Chu further argues that because the government "alleges that the enterprise started in 2018, but does not describe conduct among four people until 2022" it has failed to allege "the essential facts constituting the offense charged." (ECF 99 at 31 (quoting Rule 7(c)(1)).) Not so. The indictment has sufficiently alleged facts showing four individuals acting in concert. And courts have repeatedly held in the context of section 848 charges that the "the government need not establish that the defendant acted in concert with each of the other five persons at the same

time." See Young, 745 F.2d at 747. That the indictment does not name four individuals working in concert in an earlier portion of the charged period is not a deficiency that gives rise to a need for a bill of particulars but is rather a question of proof for trial.

With respect to Count Two, which charges conspiracy to commit bank fraud and wire fraud affecting a financial institution, Chu contends the indictment fails to adequately allege specific intent and does not explain "how Mr. Chu's communications with Kollar were—or reasonably could have been—interpreted as directives to commit fraud." (ECF 99 at 35.) Chu is mistaken. The government has presented specific allegations on exactly this point. The indictment alleges, for example, that Chu texted Kollar asking, "Can we work the > 60s[,]" or, in the government's words, "asking whether Kollar could manipulate data for loans over 60 days past due to make them appear eligible." (Superseding Indictment ¶ 14.) Chu also allegedly texted Kollar and others that "[i]n an ideal scenario, we buy and increase inventory by $10mm and then we can move the sold units off the borrowing base[,]" which the government alleges to mean that "Tricolor would increase its inventory by $10 million to give it enough cushion to remove the sold units that were fraudulently included on the Lender-2 Inventory Credit Line borrowing base." (Id. ¶ 12.) These allegations also suffice to give Chu notice with respect to the intent element of Counts Three to Six, which charge bank fraud and wire fraud affecting a financial institution, respectively.[7]

According to Chu, the securities fraud charges, Counts Seven and Eight, are also insufficiently pleaded. The specifics that Chu would like the government to identify are each

[7] The government is also not required to "identify each occurrence that constitutes part of the continuing offense[s]" alleged in Counts Three and Four that "tolled the statute of limitations." (ECF 46 at 44.) The statute of limitations for those charges is ten years. See 18 U.S.C. § 3293. The government is correct that "[t]he alleged conduct on these substantive counts took place between 2020 and 2025—*all of which* is within the 10-year statute of limitations." (ECF 83 at 29.)

allegedly fraudulent document or transaction, who prepared and disseminated the relevant misstatements, and who the third-party recipients were. Chu also argues that the government should describe how he joined or furthered the conspiracy and list the members of the conspiracy.

The government's detailed speaking indictment adequately alleges how Chu and others defrauded bond investors:

> CHU and others misrepresented Tricolor's financial condition to potential bond purchasers and others involved in the securitization process. In some securitizations, after issuing loan-backed bonds to investors based on false assurances that the underlying loans would not be impaired, the conspirators then double pledged those same loans to the warehouse lending facilities. They further manipulated recovery amounts—which funds were to be paid to the bondholders—in order to reduce payments to bondholders and divert additional cash to Tricolor.

(Superseding Indictment ¶ 17.) The government also outlines two overt acts. First, "[o]n or about March 1, 2025, DANIEL CHU, the defendant, executed a sale and servicing agreement with respect to a Tricolor asset-backed securitization." (Id. ¶ 45(a).) Second, "[o]n or about August 17, 2025, CHU told Jerry Kollar and Executive-1 that if Tricolor's loan performance had recently improved, the conspirators could try to transfer the fraudulent collateral from the SPV4 warehouse to future bondholders, stating that if the potential improvement in loan performance was 'right, then you can in theory put more shit in that securitization and it'll kind of wash out.'" (Id. ¶ 45(b).)

Further, in response to Chu's request for a bill of particulars, the government identified eleven "securitizations at issue" in a letter dated July 15, 2026. (July 16 Schwartz Decl., Ex. 14.) The letter also directed the defense to relevant investor presentations and transaction documents. One of the investor presentations "is attached to a January 4, 2024

calendar invitation for a videoconference among Chu, Kollar, a particular investor, and several investment bankers representing Tricolor." (ECF 113 at 24.) "The second one is a copy of the [ ] investor presentation [for a certain securitization], which a simple search in the discovery shows Chu himself finalized and circulated via email." (Id.) The government argues persuasively that Chu, with this information in hand, is not in the dark about the origin and destination of the relevant misstatements.

The government is not required to show how Chu entered the conspiracy or to name each member. See United States v. Bronson, 05-cr-714, 2007 WL 2455138, at *11 (E.D.N.Y. Aug. 23, 2007) ("As a general rule, a defendant is not entitled to receive details of the Government's conspiracy allegations in a bill of particulars."). The government has also adequately alleged overt acts as to Count Seven. Chu calls the first overt act "neutral[.]" (ECF 99 at 38.) But overt acts need not be unlawful, just done in furtherance of the conspiracy. United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016). Chu complains that the second overt act "occurred after the fact" of the securities fraud. (ECF 99 at 38.) The second overt act, however, discusses prospective new fraud through "transfer[ring] the fraudulent collateral . . . to future bondholders[.]" (Superseding Indictment ¶ 45(b).)

Nor is the government required to identify each alleged misstatement it will rely on at trial. If, however, Chu's reading of the July 15 letter as providing only a non-exhaustive list of the securitizations underlying Counts Seven and Eight is correct, the government will be directed to provide an exhaustive list of such securitizations. It is enough to permit Chu to prepare a defense for the government to narrow the universe of charged conduct for these counts to specific securitizations.

Similarly, Chu requests a bill of particulars "identifying each false statement the government may attempt to prove at trial" as to Counts Two to Six. (ECF 118 at 17.) The government has provided examples of alleged false statements by Chu. Further, Counts Three to Six pertain only to two specific loan facilities, SPV4 and SPV5. The government has thus already narrowed the universe of relevant conduct as it seems to have done with Counts Seven and Eight. It is not required to do more. Chu is not facing a circumstance where he must "sift[ ] through thousands of legitimate transactions in an attempt to discover which transactions the government [seeks] to prove were fraudulent." United States v. Tuzman, 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017) (Gardephe, J.) (quoting United States v. Kahale, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009), aff'd sub nom. United States v. Graham, 477 F. App'x 818 (2d Cir. 2012)). Because Chu has now been informed of the transactions, or series of transactions, at issue, he is not in an analogous position.

## III. Motion For a Franks Hearing

Chu seeks a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), to suppress the fruits of searches pursuant to warrants premised upon law enforcement applications that he contends were fatally defective because they omitted material facts.

"[W]here a search is conducted pursuant to a judicially authorized warrant, a 'presumption of validity' obtains 'with respect to the affidavit supporting the search warrant.'" United States v. Lauria, 70 F.4th 106, 124 (2d Cir. 2023) (quoting Franks, 438 U.S. at 171). To overcome that presumption and demonstrate entitlement to a Franks hearing, "a defendant must make a 'substantial preliminary showing' that (1) the affidavit contains a false statement or omission, (2) the false statement or omission was made deliberately or recklessly, and (3) the

false statement or omission was material." United States v. Curcio, 24-cr-312, 2025 WL 2416725, at *2 (S.D.N.Y. Aug. 21, 2025) (Abrams, J.).

A. Search Warrants

The first two affidavits that Chu challenges were made in support of a warrant for the search of two iCloud accounts belonging to Chu (the "iCloud warrant"), dated September 26, 2025, and a warrant for the search of Chu's Florida condominium and person (the "premises warrant"), dated October 7, 2025. The affidavits contain much the same factual support, and each establishes probable cause that evidence of the charged offenses would be located in the places to be searched.

Each affidavit relied on numerous statements by Kollar. For example, Kollar told the government that Chu not only knew about the misrepresentations Tricolor was making to lenders, but that the misrepresentations began at Chu's direction in 2018. (May 20 Schwartz Decl., Ex. 1; Ex. 3.) More specifically, "[i]n or about 2018, Chu directed Kollar to use defaulted or delinquent loans to obtain additional liquidity, by manipulating the data related to those loans so that they would appear current and thus could be pledged to a lender." (Ex. 1 ¶ 14(b); Ex. 3 ¶ 10(b).) The affidavits also state that in early 2024, Kollar informed Chu that the difference between the "amount of collateral that Tricolor actually held" and "the amount of collateral that Tricolor claimed to hold" had reached approximately $300 million. (Ex. 1 ¶ 14(b); Ex. 3 ¶ 10(b).) Chu is also alleged to have directed Kollar to delete certain "relevant records[,]" including WhatsApp messages between Tricolor executives. (Ex. 1 ¶ 14(c); Ex. 3 ¶ 10(c).)

The affidavits also included material that Seibold provided to the government. Seibold described an exchange he heard between Kollar and Chu about an auditor's discovery of

"multiple loans that were associated with the same vehicle identification numbers ('VINs')[.]" (Ex. 1 ¶ 13(b); Ex. 3 ¶ 9(b).) Chu asked Kollar "something to the effect of, 'why is this happening?[,]'" which Seibold interpreted to mean, "why didn't you change the VINs to get around the auditors?" (Ex. 1 ¶ 13(b); Ex. 3 ¶ 9(b).) Seibold also averred that he copied Chu on misleading reports that Tricolor sent to lenders multiple times per week. (Ex. 1 ¶ 11(b); Ex. 3 ¶ 7(b).)

The affidavits contain support for the assertion that Chu used his electronic devices to make and store communications relating to the charged offenses. Both affidavits explain that "Tricolor employees were not issued company cellphones and instead used their personal cellphones to conduct day-to-day business." (Ex. 1 ¶ 17(a); Ex. 3 ¶ 14(a).) Further, "Kollar recalled an incident where Chu had a disagreement with a third party about what that person had previously said, and Chu played a recording of the previous statements the person made to that person . . . [from] his iPhone or iPad[.]" (Ex. 1 ¶ 17(b); Ex. 3 ¶ 14(b).) At least some of Chu's devices have Apple iCloud accounts associated with them that have a backup feature enabled. (Ex. 1 ¶ 18(a).)

Chu argues that probable cause, had it been established, would have been defeated by certain facts had they been included in the affidavits. Most of the omissions that Chu raises as problematic were made known to him by the government through a letter dated February 19, 2026 (the "Brady letter"), in which the government, "[m]indful of its obligations, including ongoing discovery obligations and those under *Brady v. Maryland*, 373 U.S. 83 (1963) . . . ma[de] certain disclosures to assist the defense." (May 20 Schwartz Decl., Ex. 19.)

According to Chu, statements made by Kollar and Goodgame undermine the government's claim that Chu had knowledge of and participated in the alleged fraud. For one,

Kollar told the government that, on an August 2025 call, Chu "seemed to be shocked at the amount, the size of what [the double-pledging] had grown to be." (Id. at 5.) That Chu was surprised at the growth in the magnitude of the fraud does not compel the conclusion that he was unaware of the existence of fraud or that he had not directed the fraud from his position as CEO. The same is true of Kollar's statement that he "did not recall specifically speaking to Chu about misstatements in the offering memoranda" for certain securitizations of Tricolor auto loans. (Id.) Kollar may not have spoken to Chu about a specific tranche of documents but that reveals little.

Kollar also told the government that "there may have been an innocent explanation for" a message Chu sent to Kollar asking him to "estimate the max amount we borrowed against the double pledged at Ares."[8] (Id.) The Ares double pledging, according to Kollar, was an error discovered in 2020 or 2021 that Tricolor "resolved[.]" (Id.) Again, that some double pledging by Tricolor may have been in error rather than an intentional deception does little to undermine the evidence that Chu was aware of the double pledging elsewhere.[9]

Chu also claims that the affidavits excluded information that casts doubt on Seibold's knowledge of Chu's involvement in the charged conduct. The affidavits did not include Seibold's statements to the effect that he "never witnessed Chu and Kollar speaking about loan misrepresentations to each other" and that he "never spoke with Chu about Chu's conversations with Kollar."[10] (Id. at 6.) But the affidavits "already included Chu's disclaimer of

[8] The affidavits also do not include Kollar's statement on a recorded phone call that he was "not saying [Chu] knew the specifics of the borrowing bases" in response to Chu's comment that he had "zero knowledge" of "these borrowing bases." (Ex. 19 at 5.) However, the government states it was not in possession of the recording when the affidavits were sworn out. (ECF 83 at 35 n.6.) The statement therefore could not have been intentionally or recklessly omitted. Even if the government's timeline is wrong, the recorded statement is of little value to the defense case, as Kollar also told the government that while Chu "did not know the specific loans that were being manipulated in the borrowing base . . . he knew of the strategy, and how they were doing it." (Ex. 19 at 5.)

[9] Chu's reference to comments Goodgame made in an October 20, 2025, interview with the FBI is also unavailing because that interview occurred after the warrants in issue were sworn out. (See July 16 Schwartz Decl., Ex. 2.)

[10] Chu also highlights the omission of a text message Seibold sent to his mother in August 2025 that stated, "Jerry told me he had that conversation with Daniel multiple times. Maybe he lied to me." (May 20 Schwartz Decl., Ex.

any knowledge." (ECF 83 at 34.) The affidavits explained that Chu "has denied any knowledge of the Borrowing Base misrepresentations." (Ex. 1 ¶ 11 n.2; Ex. 3 ¶ 7 n.2.) The affidavits also made clear where Seibold's knowledge of Chu's involvement was indirect. (See, e.g., Ex. 1 ¶ 11(c) ("In his interview with Tricolor's outside counsel, Seibold stated he had never discussed the misrepresentations with anyone in Tricolor management besides Kollar.").)

Finally, Chu targets Kollar's purported "history of fraud." (ECF 46 at 51.) In 2017, the bankruptcy trustee of a company where Kollar previously served as CFO sued him, alleging that he "and other officers of the debtors orchestrated a multi-step scheme to siphon value from the company, including through improper loan practices[.]" (Id.) What Chu fails to acknowledge is that the suit was settled "without any admission of liability or wrongdoing[,]" a fact which greatly diminishes the probative value of the civil suit in assessing Kollar's credibility. See Joint Notice of Settlement, Chow v. Baldwin et al., 4:17-cv-00865 (E.D. Tex. Apr. 5, 2018), Dkt. No. 77.

Considering the above omissions together with the material in the affidavits, the Court determines that "there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause[.]" United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) (quoting United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000)). Kollar and Seibold implicated Chu by providing information about his ongoing knowledge of the manipulation of the company's collateral and instructions to delete relevant records. Chu does not dispute the accuracy of this information. Further, Chu's arguments do not address, and therefore fail to undermine, the evidence that he is likely to have used personal devices to handle

24.) But the government avers that it "only received the Seibold Text Message on October 16—well after the Search Affidavits were sworn to." (ECF 83 at 35.) Chu states that "[t]he government has offered no sworn declaration or other evidentiary proof that establishes when the text message was obtained." (ECF 102 at 13.) The burden, however, is on Chu to show recklessness or willful conduct. This he does not do.

company matters. The omissions are thus not fatal to the "fair probability that contraband or evidence of a crime w[ould] be found" in the areas searched. Illinois v. Gates, 462 U.S. 213, 238 (1983).

Nor has Chu offered any persuasive reasoning suggesting the omissions were reckless. "Franks protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate." Rajaratnam, 719 F.3d at 154 (emphasis in original) (quoting United States v. Awadallah, 349 F.3d 42, 68 (2d Cir. 2003)). Recklessness is not proved "simply because a reasonable person would have included the omitted information[.]" Id. Because the Court has not been "presented with credible and probative evidence that the omission[s] . . . [were] 'designed to mislead' or [were] 'made in reckless disregard of whether [they] would mislead[,]'" id. (quoting Awadallah, 349 F.3d at 68), and because the omissions are not material to probable cause, Chu is not entitled to a Franks hearing on the search warrant affidavits.

B. Seizure Warrant

Chu contends that the affidavit supporting the seizure warrant restraining Chu's bank account is also so deficient as to warrant a Franks hearing. Chu's argument fails. The bank account was initially frozen by a letter from the FBI dated January 30, 2026. (May 20 Schwartz Decl., Ex. 17 ¶ 17 n.4.) Chu filed an emergency letter motion on February 6, 2026, asking this Court to compel the government to produce the applicable seizure warrant, if any, or order the bank account to be unfrozen. (ECF 24.) The government applied for, and was granted, a seizure warrant for the account on February 9, 2026. (ECF 25.) The Court subsequently denied Chu's letter motion as moot. (ECF 27.)

The omissions from the seizure warrant affidavit that Chu deems critical are (1) all of the arguments Chu included in his February 6 letter motion, (2) unspecified "factual information" about the bank account found in the letter motion, (3) "events in the parallel bankruptcy proceeding that precipitated" the freeze, and (4) an explanation for "why judicial process was not sought in the first instance[.]" (ECF 46 at 52.)

Chu urges that these omissions were material because "they allowed the government to present the seizure as an urgent necessity rather than an attempt to retroactively justify the freeze that it had already imposed without lawful process." (Id. at 52–53.) But whether the seizure was "an urgent necessity" does not bear on the applicable inquiry, which is whether probable cause existed to link the property in the account to criminal activity. See Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1126 (2d Cir. 1993). The supporting materials in the affidavit meet that threshold. The affidavit states that Chu directed a scheme to defraud Tricolor lenders and extracted millions of dollars from the company, including during the immediate run-up to the company's declaration of bankruptcy. (Ex. 17 ¶ 15.) It also sufficiently explained the basis for the assertion that the property within the target account is traceable to the charged conduct. (Id. ¶¶ 16–17.)

Moreover, the affidavit did explain that the government had previously frozen the account. (Id. ¶ 17 n.4.) It also explained that Chu had filed a motion arguing "that the Government's freezing of the Target Account violated his Fourth, Fifth, and Sixth Amendment rights, and is contrary to forfeiture law," and included a citation to the letter motion, which is available on the docket. (Id.) Accordingly, the request for a Franks hearing on the seizure warrant is denied.

C. Request for Unredacted Materials

Chu asks the Court to order the wholesale disclosure of the government's unredacted interview notes and FBI interview reports for Kollar, Seibold, and other witnesses listed in the government's Brady letter. In the alternative, Chu asks that the Court conduct an in camera review of those materials "and order production of all portions that bear on the omissions identified in [his] Motion, on [his] alleged knowledge and intent (including his purported supervision of the continuing financial crimes enterprise), and on the credibility and scope of knowledge of Kollar and Seibold." (ECF 46 at 55.)

Chu contends he "should not be forced to litigate reckless omissions and materiality based on the government's paraphrasing and summaries of what occurred in these pivotal interviews." (Id.) The requested relief, however, is not available. Chu offers no reason to believe the government has failed to comply with its Brady obligations. Indeed, it sent Chu the Brady letter in February of this year. And witness statements not covered by Brady are subject to the Jencks Act, which "prohibits a District Court from ordering the pretrial disclosure of witness statements." United States v. Coppa, 267 F.3d 132, 145 (2d Cir. 2001).

Chu's alternative request for certain portions of the witness interviews is unlike United States v. Holihan, 236 F. Supp. 2d 255, 263–64 (W.D.N.Y. 2002), where defendants sought and were given a small amount of information "transposed" from FBI 302 interview reports. Chu's motion is not "limited to certain facts which can be distilled from the FBI 302 reports and provided in some other form." Id. at 264. The request for disclosure or in camera review is denied.

IV. Motion for Disclosure of Grand Jury Records

Chu separately moves for the disclosure of, or alternatively the in camera review of, the transcripts of the grand jury proceedings in this case and any legal instructions provided to the grand jury. For reasons to be explained, the motion will be denied.

"The court may authorize disclosure . . . of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" Rule 6(e)(3)(E)(ii), Fed. R. Crim. P. However, "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." Torres, 901 F.2d at 233. "It is well-settled that a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." United States v. Forde, 740 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (Marrero, J.) (quoting United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978)).

Chu argues that the Court should doubt the integrity of the probable cause determinations underlying the indictment because the grand jury likely was not presented with available exculpatory evidence. The Court first notes that the government was under no general obligation to present exculpatory information to the grand jury. See United States v. Williams, 504 U.S. 36, 52–53 (1992). It is true that "a knowing or reckless misleading of the grand jury as to an essential fact" warrants dismissal. United States v. Restrepo, 547 F. App'x 34, 44 (2d Cir. 2013) (summary order) (quoting United States v. Lombardozzi, 491 F.3d 61, 79 (2d Cir. 2007)). There is, however, no evidence of such abuse in this case.

First, Chu complains that the grand jury is unlikely to have seen the statements made by Kollar and Seibold that he contends were recklessly omitted from the warrant affidavits.

But some of that information was not available to the government at the time the warrants were sworn out, and the rest is not "essential fact." As explained above, that Chu may have been surprised at the eventual magnitude of the fraud and unaware of which specific loans were being manipulated does not vitiate the probative value of the evidence that Chu was aware of the strategy and he directed the larger scheme.

Chu also expresses concern that the government may not have presented details from Kollar's and Seibold's plea allocutions to the grand jury. Specifically, Kollar did not mention Chu and only described conspiring with "others." (August 3 Schwartz Decl., Ex. 16 at 30–31.) Seibold testified that he was "instructed by others at the company, including the CFO" to manipulate collateral, was directed "by the CFO" to delete certain messages, and was "involved in approving and releasing wires for [ ] funding requests that the CFO initiated at the direction of others." (August 3 Schwartz Decl., Ex. 17 at 30–31.) None of this testimony has much, if any, exculpatory value for Chu.[11] Neither defendant during his plea allocution had an obligation to catalogue the power structure of the scheme or identify who gave which directions and whether those directions originated with the individual or were passed through the individual as an intermediary.

Second, Chu makes the unwarranted supposition that evidence Seibold received secondhand from Kollar may have been presented to the grand jury as firsthand information. "The use of hearsay testimony before a grand jury raises questions about the validity of an indictment only when the prosecutor misleads the grand jury into thinking it is getting first-hand testimony when it really is receiving hearsay[.]" United States v. Diaz, 922 F.2d 998, 1005–06

[11] Chu raises the possibility that the government received exculpatory information after the filing of the Superseding Indictment that the grand jury necessarily could not have heard. Of course, the omission of any such information from grand jury proceedings could not have been reckless or knowing.

(2d Cir. 1990) (alteration omitted) (quoting United States v. Dyman, 739 F.2d 762, 767 (2d Cir. 1984)). Because no such misrepresentation occurred in the warrant affidavits, there is no basis beyond mere speculation to conclude that "the grand jury was misled about the limits of Seibold's claimed knowledge." (ECF 46 at 60.)

Third, Chu suggests that because the government has "indicated that it interprets the 'in concert' element of 18 U.S.C. § 225 to be broader than co-conspirator or aiding-and-abetting liability,'" (May 20 Schwartz Decl. ¶ 49), the jury might have been erroneously instructed on that element. The Court accepts the proposition that a showing of a good faith basis to believe that the grand jury received a legal instruction in error could provide a basis for in camera review. But a court cannot "dismiss an indictment obtained through prosecutorial misconduct or error . . . unless errors in the grand jury proceeding prejudiced the defendant by 'substantially influenc[ing] the grand jury's decision to indict[.]'" United States v. Stein, 429 F. Supp. 2d 633, 639 (S.D.N.Y. 2006) (Kaplan, J.) (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988)). In interpreting section 848, the Supreme Court has explained that "[s]ince the word 'concert' commonly signifies agreement of two or more persons in a common plan or enterprise, a clearly articulated statement from Congress to the contrary would be necessary before that meaning should be abandoned." Jeffers v. United States, 432 U.S. 137, 150 n.14 (1977). Chu has not argued persuasively that acting in concert or agreeing to "a common plan or enterprise" is necessarily different than aiding or abetting or co-conspirator liability, or so different as to result in prejudice. He has therefore not made the necessary showing for disclosure of any legal instructions.

Chu's reliance on this Court's decision in United States v. Hoey, 11-cr-337, 2014 WL 2998523 (S.D.N.Y. July 2, 2014) is misplaced. After the superseding indictment against

Hoey was filed, the Supreme Court held that but-for causation is required to apply a penalty enhancement provision of the Controlled Substances Act triggered when death results from substance use, a requirement which this Court deemed "non-obvious to the reader from the face of the statute." Hoey, 2014 WL 2998523, at *3. The Supreme Court's interpretation of the law, where there had been "no controlling precedent in this Circuit on the causation standard" and where "[t]he Department of Justice had argued against the adoption of the standard that the Supreme Court adopted[,]" warranted in camera review to determine whether the grand jury had operated under erroneous instructions. Id. There has been no intervening change in the interpretation of a statute here, and the meaning of "in concert" has remained clear from the face of the statute.

United States v. Ho, 08-cr-00337, 2009 WL 2591345 (D. Haw. Aug. 20, 2009), is also inapt. Unlike in the instant case, the defense pointed to specific on-the-record statements by the prosecution evincing a misunderstanding of one of the elements it was required to prove. Ho, 2009 WL 2591345, at *4. Chu has not made any showing that the government's statement regarding the meaning of "in concert" was incorrect.

Chu's remaining argument is that the grand jury may have relied too much on the narratives of cooperating witnesses who were incentivized to "minimize their roles and instead blame Mr. Chu," given the purported "lack of documentary or other evidence" of Chu's guilt. (ECF 46 at 60–61.) The Court is unpersuaded. See United States v. Shyne, 05-cr-1067, 2007 WL 1075035, at *9 n.5 (S.D.N.Y. Apr. 5, 2007) (Karas, J.) ("Courts are uniform in their agreement that policing the sufficiency of the evidence presented to the grand jury is outside the realm of the federal courts."); Kaley v. United States, 571 U.S. 320, 328 (2014) ("The grand jury

gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.").

V. Motion to Preclude Evidence and Quash Subpoenas Based on Abuse of the Grand Jury Process

Chu asks the Court to quash grand jury subpoenas and suppress evidence based on purported abuse of the grand jury process. The grand jury may not be used for the "sole or dominating purpose of preparing an already pending indictment for trial." In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Robert M. Simels, Esq.), 767 F.2d 26, 29 (2d Cir. 1985) (quoting United States v. Dardi, 330 F.2d 316, 336 (2d Cir. 1964)). "A grand jury, however, may continue its investigation into further criminal activity—even when the resulting evidence may relate to pending indictments—so long as the subpoena does not manifest such a dominating purpose." United States v. Bergstein, 16-cr-746, 2017 WL 4535944, at *1 (S.D.N.Y. Oct. 10, 2017) (citing United States v. Leung, 40 F.3d 577, 581 (2d Cir. 1994)). And grand jury subpoenas are presumed to have a proper purpose, even when a subpoena is issued post-indictment. See Leung, 40 F.3d at 581; United States v. Punn, 737 F.3d 1, 6 (2d Cir. 2013).

The Second Circuit describes the burden-shifting framework that applies when a court must "determine whether trial preparation is the 'sole or dominant purpose' for a grand jury subpoena" as follows:

> The defendant has the initial burden of presenting "concrete allegations of Government misconduct." *Leung*, 40 F.3d at 582. Once a defendant has put forward such allegations, the Government must "come forward with evidence of specific grand jury activity in connection with the . . . investigation," *id.*, and thereby show that the subpoena was not motivated by an improper purpose. The defendant then has the burden of showing that the government's explanation was a pretext for abusing the grand jury process by "utiliz[ing] a [g]rand [j]ury for the sole or dominating purpose of

> preparing an already pending indictment for trial." *Punn*, 737 F.3d at 6 (quoting *Simels*, 767 F.2d at 29).

United States v. Calk, 87 F.4th 164, 186 (2d Cir. 2023). The timing of a subpoena, whether the grand jury has been actively investigating, and the surrounding facts and circumstances are relevant to determining the dominating purpose of a subpoena. See Simels, 767 F.2d at 29–30. "[A]t the initial stage, the defendant must identify concrete reasons for a court to question the Government's purpose for issuing a grand jury subpoena." Calk, 87 F.4th at 186; see also Punn, 737 F.3d at 6 (explaining that "the defendant must present particularized proof of an improper purpose") (internal quotation marks and citation omitted).

Chu submits that the government misused the grand jury process first by continuing to collect returns from pre-indictment subpoenas after obtaining the original Indictment. His position, however, that because "the Superseding Indictment added only a limited set of securities fraud charges, and a single new factual allegation" the government necessarily could not have been "investigating any new conduct" is illogical. (ECF 99 at 56.) The government did bring new charges. And even where no additional charges are brought based on post-indictment subpoenas, it is not proof of an improper purpose. See Leung, 40 F.3d at 581–82.

Second, Chu argues that new subpoenas issued after the original Indictment were improper because they, too, "were not designed to investigate potential new charges or new defendants" but rather to continue investigating "the conduct already charged." (ECF 99 at 57.) As the government explains, "[t]he investigation here did not stop with the original Indictment; it continued, as the law allows, and resulted in the Superseding Indictment." (ECF 113 at 32.) Chu's reliance on Calk, 87 F.4th 164, is misplaced. The Second Circuit held that the defendant met his initial burden by pointing out that a witness had been subpoenaed "twenty months into

the pendency of the case, with a trial date approaching" after the witness had rebuffed multiple requests by the prosecution for an informal meeting. Id. at 186–87. The instant circumstances present no comparable eyebrow-raising sequence of events. Moreover, the government has made an ex parte submission outlining its reasons for issuing the six subpoenas that Chu raises. The Court is persuaded that those subpoenas are not for the sole or dominating purpose of gaining evidence for trial.

Finally, Chu urges that the government "admit[ted]" at the most recent status conference in this case that it was "not simply receiving compliance with a subpoena over time, but was actively requesting additional, unspecified categories of materials from the [Tricolor] trustee as its trial preparation evolved." (ECF 118 at 22–23.) What the government actually said at the conference was: "We have not identified gaps of materials. We have had an iterative process with the trustee where if we did believe there were materials missing, we requested them, but we are not aware of things that are missing." (Aug. 3 Schwartz Decl., Ex. 15 at 17.) The Court did not and does not now understand the government's statement to mean, as Chu puts it, that the government may be "asking the Trustee for documents on specific subject matters, or to rebut certain arguments, to develop its proof at trial." (ECF 118 at 24.) Instead, the Court understood the government to be describing "the ordinary back-and-forth that accompanies subpoena compliance where voluminous documents are concerned." (Id. at 23.)

Chu has not met his burden of coming forward with "particularized proof of an improper purpose." Punn, 737 F.3d at 6. The motion will be denied.

VI. Motion to Suppress Evidence Seized Pursuant to the Premises Warrant

Chu seeks the suppression of certain photographic evidence as beyond the scope of the premises warrant. The government, committing to avoid using the photographs in its case-in-chief, asks the Court to deny the motion as moot. Chu responds that "the government's representation that it does not intend to use the photographs 'in its case-in-chief' does not moot the motion." (ECF 102 at 20.) Chu's reasoning is that the government's representation does not eliminate the possibility of other uses, including in cross-examination of defense witnesses. The Court will defer ruling on this issue until a later stage of the proceeding.

CONCLUSION

For the reasons stated above, Chu's motion for a bill of particulars as to Counts Seven and Eight is GRANTED in part. The government shall confirm that its list of securitizations underlying Counts Seven and Eight is exhaustive or provide such an exhaustive list within 14 days of this Order. Chu's motions delineated in the first paragraph of this Opinion and Order are otherwise DENIED. The Court will continue the provisional sealing currently in place. The Clerk is respectfully directed to terminate the motions at ECF 42 & 97.

SO ORDERED.

Dated: New York, New York
August 14, 2026

P. Kevin Castel
United States District Judge