UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

25-cr-579 (PKC)

-against-

OPINION AND ORDER

DANIEL CHU,

Defendant.
-----------------------------------------------------------x

CASTEL, Senior District Judge

Defendant Daniel Chu moves to suppress all evidence seized pursuant to search warrants for electronic devices at his residence, electronic devices on his person, and his iCloud accounts. Chu does not challenge the issuance of the judicially approved warrants. Instead, he challenges their execution. (Oral Arg. Tr. at 11..[1])

Chu asserts that the government's review of the devices and the iCloud accounts for responsive material flagged a large quantity of non-responsive material as responsive. As a result, he urges that the ultimate seizure greatly exceeded the bounds of the warrants, so the contents of the devices and iCloud accounts should be suppressed in their entirety.

The Court granted Chu's request for an evidentiary hearing. At the hearing four law enforcement agents who conducted the responsiveness review testified, as well as an expert in document review called by Chu. This Opinion and Order sets forth the Court's findings of fact and conclusions of law.

[1] References to "Oral Arg. Tr.__" are to the transcript of argument on September 24, 2026. References to "Tr.__" are to the evidentiary hearing held on October 7-8, 2026.

Because the Court finds that the searches and second-stage responsiveness review were both objectively and subjectively conducted in good faith, the Court declines to grant the motion to suppress all fruits of the searches. But, as more fully described herein, the Court does find that the practice of deeming responsive an entire chain of text messages because one or more individual messages were responsive to the warrant when the chain spans many years and contain only a small number of messages responsive to the warrant resembles a general search. Thus, the entirety of text message chains with Chu's wife, brother, an adult child, and a board member (DX 1, DX 2, DX 61 & DX 66) will be suppressed.[2]

The Nature of the Investigation and the Issuance of the Warrants

The investigation by law enforcement led to an indictment of Daniel Chu for a systematic fraud in connection with the operation of Tricolor LLC ("Tricolor"). Chu was the Chief Executive Officer of Tricolor, a business that provided subprime financing to used car buyers who bought their cars from Tricolor. According to the Superseding Indictment, the company employed over 1,500 people, had over $1 billion in revenue in 2023 and 2024, and, at the time of its bankruptcy filing in 2025, held over 60,000 car loans.

Tricolor relied on credit from lenders collateralized by car loan receivables, as well as used cars. The gist of the principal allegations against Chu is that he, together with other senior executives of Tricolor, defrauded investors and lenders by double-pledging collateral and

[2] DX 1 is a text chain between Chu and his wife that spans from April 11, 2021, to October 7, 2025. DX 2 is a text chain between Chu and his daughter that spans from February 5, 2014, to October 5, 2025. DX 65 and DX 66 are text chains between Chu and Kathryn Petralia, a Tricolor board member and head of Tricolor Financial, that spans from October 27, 2020, to September 9, 2025. DX 61 is a text chain between Chu, his brother, and an unidentified third person that spans from July 5, 2012, to an unknown date.

misrepresenting the loans made to Tricolor customers to conceal that they were delinquent or ineligible under lenders' requirements.

The government sought and obtained a search warrant in this District on September 26, 2025, for Chu's two iCloud accounts. It also sought and obtained two search warrants, issued on October 7, 2025, in the Southern District of Florida, to search of Chu's person and residences for electronic devices for "evidence, fruits, and instrumentalities" of the "Subject Offenses." [3]

These judicially approved warrants identified 13 categories of information. Some of these categories sought information that could easily be identifiable. (See, e.g., Category 2 ("Evidence of Tricolor's lending arrangements, such as loan documents, loan payment files, and loan value computations.")) But other categories, though described with particularity, sought information that may require an in-depth understanding of the investigation to identify. (See, e.g., Category 10 ("Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses"), Category 12 ( "Evidence of the motive to commit the Subject Offenses. . . .")).

At the time of the Magistrate Judge's review and issuance of the warrants for seizure of electronic devices from Chu's person or at his residence, it was not known how many devices would be found. Ultimately, 21 devices were seized pursuant to the warrants. Because of the massive amount of information possibly stored on a device and the frequent inability to access the information on the spot, a warrant may authorize law enforcement to seize the device and review its content at a later time and place for materials responsive to the warrant. Rule

[3] Chu is charged under the financial criminal enterprise statute. 18 U.S.C. § 225. He is also named in seven other fraud-based counts, including bank fraud, wire fraud, and securities fraud.

41(e)(2)(B), Fed. R. Crim. P. The warrants issued here authorized such post-seizure review for materials responsive to the 13 categories of information.

The warrant applications described the individuals who would conduct searches of the Electronically Stored Information ("ESI"), including "law enforcement officers and agents." (See, e.g., ECF 125-3 — Premises Warrant). They also described several techniques that may be used to search the ESI for responsive material, including: "performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. . . ." (ECF 125-4 — Warrant Application.) The warrant application pointed out that "[k]eyword searches alone are typically inadequate to detect all information subject to seizure." (Id.) The warrants placed no limitations on the manner of conducting the responsiveness review.

The Seized Accounts and Devices

On October 24, 2025, the government sent Chu's counsel a spreadsheet identifying and describing the seized 21 devices, photos of the devices, and a rough map of the location where the devices were seized. (Kroll Decl. ¶¶ 6, 10–11; Tr. 14.) Apple complied with the warrant for Chu's two iCloud accounts on October 30, 2025. (Kroll Decl. ¶ 7.)

Chu's lawyers identified several devices that were unlikely to contain any responsive material because they were not devices Chu used. (Id. ¶ 12.) Based upon a brief review, the government concluded that three of the 21 devices were not likely to contain responsive material. (Id. ¶ 13.) Eight of the 21 devices could not be accessed. (Id. ¶ 9.)[4]

[4] A total of eight devices were returned to defense counsel in April 2026. (Kroll Decl. ¶ 7; Tr. 10.) Of these devices, the FBI could not access two. (Kroll Decl. ¶ 7.)

An FBI Computer Analysis and Response Team ("CART") created forensic images of the ten remaining devices. (Id. ¶ 15.) According to Chu's counsel, the ten imaged devices contained 3.57 terabytes of data, which included applications and files necessary to run a program. (Schwartz Decl. ¶¶ 9–10.)

At the government's request, on November 20, 2025, Chu's lawyer provided a list of names of lawyers with whom Chu consulted. (Kroll Decl. ¶ 16.) The ten devices were first screened by a privilege review team within the United States Attorneys' Office ("USAO"). (Tr. 32.) They were then turned over to the case team, which consisted of the four agents and, at the time of the searches, two Assistant United States Attorneys ("AUSAs"). (Id. at 32, 53–54.) The first batch of materials from the search warrants was released by the filter team to the case team in early December 2025. (Id. at 89–90.)

One of the ten devices, Chu's laptop (1B2) was imaged but not reviewed because that laptop was previously produced in response to a grand jury subpoena. (Kroll Decl. ¶ 20.) Accordingly, no material response to the search warrant was designated from this device. (Id.) Two other devices (1B15 and 1B19) were manually reviewed and determined to have no responsive material. (Id. ¶ 19.) One other device, a voice recorder (1B3), contained only one recording deemed responsive. (Id. ¶ 21.)

Of the remaining six devices plus two iCloud accounts, agents on the case team conducted a responsive review using the Cellebrite for cellphone or tablet review, Relativity for emails, chats, and documents, and Axiom for computer images. (Id. ¶ 22.) After its review, the government deemed no material from two of the six devices (1B4 and 1B7) as responsive. (Id. ¶ 29.)

The Motion to Suppress

Chu moved to suppress the entirety of the materials seized from the devices and iCloud accounts as the product of an unreasonable search and seizure. In the alternative, Chu sought an evidentiary hearing. According to Chu, on January 30 and February 3, 2026, the government produced 4.3 terabytes of data from images of Chu's two iCloud account and 3.57 terabytes of data from the ten imaged devices seized during the execution of the premises warrant, a total of 7.87 terabytes of data..[5] (Schwartz Decl. ¶¶ 9–10.)

From this universe of initially seized and imaged data, Chu asserts that the government has produced more than 220,000 purportedly responsive documents. (Id. ¶¶ 13–15 & 20.) Chu implicitly acknowledges that the number he references is overinclusive — some of these documents are attachments to already-included email chains, and some are attachments to already-included chat message chains. (Id. ¶¶ 20–23.) Adjusting for this, Chu asserts that "[i]n total, the government has produced 21,473 'responsive' parent emails and 24,456 'responsive' chat message chains, along with 3,613 standalone documents." (Id. ¶ 24.) Chu claims that of the 21,473 purportedly responsive emails, 7,298 (or 34%) are blank emails and 2,158 (or 10%) are junk emails, i.e., mass marketing communications. (Id. ¶¶ 53–58.)

With respect to chat or text messages, Chu points out that the government marked as responsive entire chat message chains with Chu's wife, brother, and two adult children; "many" dated back to 2014 and "some" to 2012..[6] (Id. ¶¶ 66–81.) Chu asserts that of the 24,456 purportedly responsive chat message chains, 5,256 (or 21%) were with immediate family members. (Id. ¶ 66.)

---

[5] Both sides refer to "data" on a device. This concept includes not just ESI in any conventional sense but also system files, executable files, and applications that make the device fully operable. (Oral Arg. Tr. 31.)

[6] In some instances, material had been removed from the entire chain by the government's privilege review team before the materials were sent on to the case team. (Tr. 142, 310.)

Chu next argues the government's inclusion of communications protected by spousal privileges is an example of a "complete and utter failure to conduct the search review in good faith." (ECF 111 at 24.) The government responds that some of these allegedly privileged documents were, in fact, responsive to the warrant. (ECF 124 at 22–23.)

In addition to exemplar of materials that were designated as responsive but in Chu's view should not have been, Chu's counsel has prepared and submitted three Appendices of what it views as non-responsive material. (Id. at Appendix A (blank emails), Appendix B (junk mail), & Appendix C (personal communications).)

The government responded to the motion, asserting that of the ten devices imaged, .051 terabytes (or 1.4%) were designated as responsive. (Kroll Decl. ¶ 30.) Of the iCloud accounts, .0075 terabytes (or 0.17%.[7]) were designated as responsive. (Id.) In total, only 0.0585 terabytes (or 0.74%.[8]) of the 7.87 terabytes imaged were designated as responsive.

The government pointed out that many documents Chu argued were non-responsive were, in fact, responsive. For example, the government noted that the chat message chains with Chu's wife, daughter, and son included responsive material. (See Logarajah Decl. Ex. A (text chain between Chu and his wife discussing Chu's need for liquidity and conversations with lenders), Ex. B (text chain between Chu and his daughter discussing purchase or sale of luxury properties), Ex. C (text chain between Chu and his son detailing payment to university where son works).) In a message with lenders in which Chu announces the birth of his child, Chu's next message in the chain confirms that there had been agreement upon a financing term

---

[7] The Declaration of Special Agent Kroll claims that 0.0075 terabytes, or "approximately 0.001% of the overall size of the iCloud accounts," is marked as responsive. (Kroll Decl. ¶ 30 (emphasis added)). However, 0.0075 terabytes divided by 4.3 terabytes, the amount of data in the images of Chu's iCloud accounts (Schwartz Decl. ¶ 9), is 0.17%.
[8] The Declaration of Special Agent Kroll claims that "[t]he total volume of data marked responsive to the Warrants is approximately 0.08%." (Kroll Decl. ¶ 30 (emphasis added)). However, 0.0585 terabytes divided by 7.87 terabytes, the amount of data in the images of Chu's iCloud accounts and ten imaged devices (Kroll Decl. ¶ 18), is 0.74%.

sheet. (Id. Ex. D.) The so-called "flirty texts with a woman from 2014," taking place before Chu's marriage to his present wife, was with the head of "Tricolor Financial," and the chain contains messages about reaching out to victim lenders. (Id. Ex E)..[9] One of the purported "junk" emails was sent to a lender victim and included a Tricolor management presentation that discussed financing. (Id. Ex. G.) Other junk emails were news alerts about Tricolor's bankruptcy trustee's allegations of fraud and resulting DOJ investigation. (Id. Ex. I & J.) Additionally, the government notes that the appendix of blank emails includes more than 50 emails containing "substantive" attachments, including one sent to a lender with a description of Tricolor's business. (Id. at 28 & Ex. K.)

At oral argument, the government reiterated its position in its memorandum that it will not offer non-responsive documents into evidence, including exhibits to the Schwartz Declaration. (Oral Arg. Tr., Govt. Mem. at 20.)

Following argument, the Court ordered an evidentiary hearing.

The Hearing

At the evidentiary hearing on October 7–9, 2026, the government called each of the four participants in the responsiveness review. Chu called a representative of the vendor organizing the defense's electronic materials, including materials received by the government. The Kroll, Logarajah, and Schwartz Declarations that had been submitted on the motion to suppress were received into evidence. (Tr. 10, 12 & 351.)

The second-stage responsiveness review contemplated by Rule 41(e)(2)(B), Fed. R. Crim. P., was conducted by Special Agents Nicholas Kroll and Timothy Kash of the FBI and

[9] Chu counsel asserts that the individual was a board member. (Tr. 141.)

Special Agents Christopher O'Rourke and Jeremy Rosenman of the Federal Deposit Insurance Corporation Office of Inspector General ("FDIC-OIG"). Kroll had been responsible for "numerous" electronic media searches over the course of his career. (Id. at 171.) Kash had worked in the securities fraud squad since April 2024 and before that in the national security arena. (Id. at 174.) O'Rourke has been with FDIC-OIG for two years and had previously been a Special Agent of the U.S. Postal Service for eight years. (Id. at 319.) Rosenman has been with FDIC-OIG for two years and had previously been a Special Agent in the United States Attorney's Office ("USAO") for the Southern District of New York for eight years. (Id. at 411.) Each was a trained law enforcement agent but none of them claimed to be an expert or specialist in information technology.

The case team consisted of the four agents and, at the time of the searches, two AUSAs. (Id. at 53–54.) The agents who were part of the case team were responsible for tagging responsive material. (Id.) None of them had supervisory responsibility. (Id.) The AUSAs on the case team discussed the status and progress of the agents' work but never dictated how the responsiveness reviews should be conducted. (Id. at 179.) As Special Agent Kash put it: "[i]t was more of a collaborative effort. For example, if I had resource constraints and I wasn't able to cover a certain item, somebody else could cover that for me. It was a dialogue. It wasn't one point of leadership." (Id. at 205.) A December 4, 2025, email from one of the AUSAs advised the four case agents as follows: "[f]or phones, I'd say it's a reasonable combination of search terms, pulling chat threads with relevant contacts, and photo/audio/video review. If there are emails, likely best to export them to Relativity [a document review platform] for review there." (GX 3501-08.) The email attached the 13 categories of responsive documents from the premises warrant. (Id.)

Each agent testified about his methodology in conducting the search. Special Agent Kroll testified that the 13 categories of materials for which a search was authorized dictated the responsiveness review. (Tr. 31–32.) He reviewed the categories before and during the review. (Id.)

A device referred to as 1B21 was seized from Chu's person and was his primary phone. (Id. at 45.) Kroll reviewed its contents using the Cellebrite platform. (Id. at 17, 45.) Cellebrite permits a "more robust" review of the content of cellphones. (Id. at 33.) Kroll testified that he personally reviewed any item marked responsive on the 1B21 and the portion of the one iCloud account that he also reviewed. (Id. at 17.)

Kroll's practice, which was consistent with the other agents, was that when he located a responsive item in a chat or text message thread, he would mark the entire thread as responsive. (Id. at 18, 177.) The thread was continuous and not separated by day, month, or year. (Id. at 18.) He testified that this was a consistent practice he used in all cases and he did this so the full context and timeline could be understood. (Id. at 18–19.) He mentioned to one of the prosecutors that he was tagging full threads of chats or text messages and the AUSA expressed to him his belief that this was appropriate. (Id. at 19, 22, 153.) Some of the chats included extensive material prior to 2018, the period covered by the indictment. (Id. at 154.) Kroll, on cross-examination, acknowledged that he could not say for certain how other agents on other cases designated chat threads. (Id. at 119.)

Special Agent Kash testified that in prior cases he has consistently followed the practice of tagging the entire chain if there was any responsive material within the chain. (Id. at 177.) He did this to place the relevant material in context and also based on his experience with other agents who followed the same practice. (Id.) Special Agent Rosenman testified that it

"had been the past practice for several years when reviewing . . . chats from a cell phone, was to . . . tag the entire chat." (Id. at 414.) Rosenman was asked why he did not just tag the specific portion of the thread that triggered the responsiveness determination:

> [S]ome people have chats on their phone that are years old and are hundreds of thousands of pages long, so you'd have to go through each chat to see, as to each individual message, whether or not it's responsive, so it would take hundreds of hours to do that. And people don't normally speak in chat sort of in a linear fashion, you might go from one subject to another and then come back to a subject over time, and so you lose context if you don't have the entire chat thread.

(Id.)

Kroll testified that a text thread with Chu's wife "hit" on multiple keyword search terms, including the "pursuit of establishing an offshore trust to potentially house the disposition of funds as resulting this fraud" and "conversations about meetings with lenders." (Id. at 19–20.) He followed the same practice of tagging the entirety of a thread for the iCloud account that he reviewed on the Relativity platform. (Id. at 152.)[10] In conducting searches on Cellebrite of Chu's phone (1B21), Kroll also used the Cellebrite "timeline feature" to input the dates of key events and the name of individuals of interest to the investigation. (Id. at 39–40.)

Special Agent Kroll utilized a search-term list put together by Special Agent Rosenman supplemented by additions by Special Agent Kash. (GX 3501-26, 3501-28.) One of the terms on the list was "Tricolor," the name of the company that was allegedly utilized to commit the fraud; Chu's email address also contained the term "Tricolor." The defense made the valid point that use of Tricolor as a search term was doomed to be overinclusive. Rosenman

[10] It was stipulated at the hearing that Relativity "has a product that allows users to search individual messaging, including message metadata and provide coding messages at the message level." (Tr. 165.) The version of Relativity utilized by the agents was not identified but was provided by a third-party vendor identified as PAE. (Id. at 434.) There was no evidence that the version used by the four special agents had such a feature.

testified that "[i]t was reasonable to me because Tricolor is the central . . . company to the fraud that we're investigating, so any message or email that might mention the company could possibly be responsive." (Tr. 418.)

Special Agent Kroll testified that he did not automatically mark as responsive any material that "hit" on the word Tricolor, stating that he "would view where those hits occurred in which datasets and review the content for what would be . . . potentially responsive information." (Id. at 36–37). Kroll testified that he did not use defendant's wife's name or any other family member's name to search for responsive documents. (Id. at 40.)

Kroll had principal review responsibility for material on one iCloud account, which he examined on the Relativity platform that allowed him to use search terms. (Id. at 40–42.) His recollection was that text messages on Relativity appeared as "one continuous thread." (Id. at 41.)

Special Agent O'Rourke noted that because there were multiple investigative agencies involved, each agent could use Relativity from their own workstations without firewalls or clearances. (Id. at 321.) Special Agent Rosenman was unaware of any other tool at the time in use by the USAO that allowed cross-agency collaboration. (Id. at 412.)

Special Agent Kroll also reviewed the forensic image of the contents of a laptop (1B10). (Id. at 35.) Some unspecified quantity of material was marked as responsive and there is no indication that Chu has mounted any specific challenge to the responsiveness review of this device.

Special Agent Kash reviewed device 1B4 — a phone — and "aspects of" 1B7 — an Apple tablet. (Id. at 178.) Before conducting the review, he consulted the categories of permissible seizures in an attachment to the relevant warrant. (Id. at 180.) Kash then reviewed

substantially all data on the phone using the Cellebrite platform. (Id.) While he did not rely upon the use of search terms, Kash claims he may have conducted "one or two searches" using the terms. (Id. at 181, 210.) The owner of the phone was "John Felch," which Kash believed to be an alias. (Id. at 181.) He described "substantially all" of the phone's content as "romantic" and "embarrassing." (Id. at 182.) Kash found no evidence to link the phone to the defendant, (id. at 266), and he marked none of the material on it as responsive. (Id. at 182.)

Device 1B7 was an Apple tablet that Kash reviewed on the Relativity platform. (Id. at 183.) He reviewed the warrant at the outset of his review. (Id. at 183.) He reviewed "aspects of" approximately 27 chats on the device. (Id. at 269.) None of the material on 1B7 was marked responsive. (Id. at 184.)

On cross-examination, Kash acknowledged that individual messages within a chain of messages can be reviewed on Cellebrite by checking a box. (Id. at 190–91.) He also confirmed that there are other platforms to conduct reviews, and he recommended Axiom for reviewing the content of laptops. (Id. at 192–95; GX 3501-05.) On cross examination, Kash was asked whether the agents could have used AI tools. He responded: "I understand that conceptually as a possibility, but I don't have any direct experience." (Tr. 206.)

Special Agent O'Rourke reviewed devices 1B1 and 1B5. From 1B1, he reviewed emails and documents and from 1B5 he reviewed emails, documents and text chats. (Id. at 320–21.) There were approximately 90,000 documents on 1B1 and 20,000 documents on 1B5. (Id. at 441.) O'Rourke utilized the Relativity platform for the review. (Id. at 321.) O'Rourke reviewed the categories of responsive documents from the search warrant in conducting his review. (Id. at 322.) He then used search terms in conducting his review, entering them one-by-

one rather than inputting them all together. (Id. at 325.) O'Rourke also included some search terms of his own not included in the joint circulated list. (Id. at 364, 374.)

One of the AUSAs on the case cautioned the four agents against over designation of responsive material: "[o]n the responsiveness reviews, we wanted to follow up on the Relativity emails/docs. Makes sense to use search terms, but we also want to make sure that we are doing a QC [quality control] of a term's hits so that we're checking they don't produce a bunch of false positives." (GX 3501-50.) The AUSA closed by noting his and another AUSA's availability for "a quick call to discuss." (Id.) Rosenman reached out to one of the AUSAs via email and wrote, "I can also share my screen and walk you through what I did. I did the same for Kroll since he was unfamiliar with Relativity. I think I get to roughly about 35% responsive which seemed reasonable." (DX 3501-48.) According to O'Rourke, the conversations with the AUSAs discussed "[t]hat there were a lot of documents we were marking as responsive and that we should do a deeper dive to try to cull it down to a smaller amount and eliminate anything that was clearly non responsive." (Tr. 327.) Because of concerns expressed by team members, O'Rourke conducted further review of the materials he had tentatively determined to be responsive. (Id. at 379.)

O'Rourke sought and obtained Rosenman's input about the quality control ("QC") process. (Id. at 332–33.) Based in part on this input, O'Rourke searched within the universe of items he initially deemed responsive and removed items that were not, in fact, responsive. (Id. at 325–26, 334–35.) By manual review, he would, for example, identify the name of a company, e.g., a merchant or a newsletter, whose activities were considered nonresponsive; he would then remove all items related to it by searching for material with the name or email address of the nonresponsive source. (Id. at 335–36 (discussing O'Rourke's removal of "Nike" and "Black

Friday" hits from the database), 342.) O'Rourke maintained a spreadsheet that was introduced at the hearing. (GX 3501-70, Tr. 330–32.) In this spreadsheet, he listed the search terms he used, the number of responsive hits before QC, and the number of responsive hits after QC. (GX 3501-70, Tr. 330–32.) O'Rourke took several hours a day over the course of a week engaging in the QC review. (Tr. 343.) For the search term "Tricolor," 25,000 documents were removed in the process. (Id. at 346.) There were approximately 90,000 emails in device 1B1. (Id. at 402.) Originally, 78,000 emails were tagged as responsive. (Id.) But after further review, that number was reduced to around 48,000. (Id.) On cross-examination, O'Rourke credibly denied that he was trying to achieve any particular percentage of responsive documents. (Id. at 381–82.)

Furthermore, on cross-examination, O'Rourke did not dispute that, even after QC, the responsive emails in his batch included errors. (Id. at 390–93.) For example, one email, with a subject line containing the name of Chu's young child, included an attachment of a photo of what is presumably Chu's young child in a Santa suit. (Id.) O'Rourke acknowledged that its inclusion was an error, though he denied having ever known the name of the child and did not recall seeing it during his review. (Id.) This photo was not the only family photo that was erroneously tagged. (Id. at 393–94.)

Special Agent Rosenman conducted a responsiveness review of a voice recorder, an iCloud account, and chats on 1B1, 1B7, and 1B21. (Id. at 411.) The warrants guided his review. (Id. at 424.) He utilized Relativity to review the materials from the iCloud accounts and from devices other than the voice recorder. (Id. at 411–12.) Rosenman explained his method of searching was a combination of utilizing search terms, looking at the number of resulting hits, and spot checking the contents of the documents. (Id. at 417.) As noted above, he followed the practice of marking an entire chat or message thread as responsive if responsive material was

found anywhere within the thread. On cross-examination, Rosenman was shown portions of chats that had been designated as responsive but discussed nonresponsive matters, including family matters between Chu and his siblings or Chu seeking advice on procuring a Wi-Fi extender. (Id. at 479, 485.)

Other nonresponsive material marked responsive by the agents included junk mail advertisements and marketing material, (id. at 397–99; see e.g., DX 38–48, DX 68–70, DX74), an email confirming a restaurant reservation, (DX 49), and numerous blank emails — emails with a subject line but no substantive textual content. (Tr. 396; see e.g., DX 27–36, DX 51, DX 56, DX 73.)

Chu called as a witness John DeBois, vice president of engineering for Rational Enterprise, a software company that specializes in e-discovery and document management, including in the context of litigation. DeBois also assists the defense. (Tr. 296–98.) This work "entailed receiving a large volume of data in different formats, loading that data into the system, ensuring that the data was searchable and viewable, things of that nature." (Id. at 298.) DeBois claimed familiarity with the products of his competitors, and he considers Relativity a competitor. (Id. at 297.) He further testified that Cellebrite produces a "UFDR" file that can be used on other platforms, including Rational and Relativity. (Id. at 299–301.) DeBoise further explained that, with the UFDR file, a user has the capability to extract individual messages and filter for certain portions or subsets of messages before loading them onto Rational or Relativity. (Id. at 302.) DeBois also conceded that he does not use Relativity on a day-to-day basis and has not uploaded data onto the Relativity platform. (Id. at 313–14.)[11]

[11] While the defendant bears no burden with respect to a government search and seizure, DeBois testified without objection that he has the capability to compare the full image of chat messages produced by the government against the government's responsiveness review. (Tr. 318.)

Each of the four agents and defendant's sole witness all testified credibly at the hearing.

The Fourth Amendment Requirements for a Search of Electronic Devices

The Fourth Amendment affords protection "against unreasonable searches and seizures." U.S. Const. amend IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." Riley v. California, 573 U.S. 373, 381–82 (2014) (internal quotation marks and citations omitted).

Large volume reviews of ESI seized pursuant to warrant have presented challenges to prosecutors, defense counsel, and courts. Analogies to searches of paper records have been found at times to be unhelpful. See United States v. Ganias, 824 F.3d 199 (2d Cir. 2016) (en banc) (rejecting an analogy to a search of a file cabinet). It was not until 2014 that the Supreme Court resolved a Circuit split by concluding that a warrant was necessary to search the contents of a cell phone seized incident to an arrest. Riley, 573 U.S. at 386. The Riley Court marveled at how far technology had advanced in the decade before its decision years. Id. at 385. Now, more than a decade after Riley, it is not unusual that the family home of a businessperson might contain multiple devices storing nearly eight terabytes of data..[12]

"In the case of electronic evidence, which typically consists of enormous amounts of undifferentiated information and documents, courts have recognized that a search for documents or files responsive to a warrant cannot possibly be accomplished during an on-site search." In the Matter of a Warrant for All Content & Other Info. Associated with the Email

[12] See, e.g., United States v. Daskal, 676 F. Supp. 3d 153, 160 (E.D.N.Y. 2023) (approximately 30 computers seized from a residence); United States v. Wey, 256 F. Supp. 3d 355, 374 (S.D.N.Y. 2017) (eighteen terabytes of data seized).

Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc., 33 F. Supp. 3d 386, 392 (S.D.N.Y. 2014) (Gorenstein, M.J.), as amended (Aug. 7, 2014) (collecting cases).

Rule 41(e)(2)(B) provides that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." According to the 2009 Advisory Committee Note, "This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Neither Rule 41 nor the language of the warrants "compel a specific method" of responsiveness review. See United States v. Daskal, 676 F. Supp. 3d 153, 177 (E.D.N.Y. 2023). In United States v. Ulbricht, the Circuit expressly rejected the argument that a search warrant should set forth the "search terms and protocols" for a responsiveness review. 858 F.3d 71, 102 (2d Cir. 2017), overruled on other grounds by Carpenter v. United States, 585 U.S. 296 (2018)

United States v. Shi Yan Liu, 239 F.3d 138 (2d Cir. 2000), is instructive on how to approach a motion to suppress the entire fruits of a search, the relief that Chu seeks. Shi Yan Liu addressed a conventional non-electronic search and seizure in which the defendant urged that the "search was conducted in 'flagrant disregard' of the warrant such that all fruits of the search must be suppressed." Shi Yan Liu, 239 F.3d at 140 (emphasis in original). The Court concluded that wholesale suppression is "required only when (1) they effect a 'widespread seizure of items that were not within the scope of the warrant,' and (2) do not act in good faith . . . ." Id. (internal citations omitted). "The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." Id. at 141. A general search is a search that may be described as a "wide-ranging exploratory search" or an "indiscriminate rummaging." Id. at 140 (quoting Maryland v.

Garrison, 480 U.S. 79, 84 (1987); United States v. George, 975 F.2d 72, 75 (2d Cir.1992)). "[T]o satisfy the first prong of the two-part test described above, the search conducted by government agents must actually resemble a general search." Id. (emphasis in original).

The Shi Yan Liu Court focused on the first prong — whether the actions of the agent in conducting the search were characteristic of a general search unbounded by the Fourth Amendment's particularity requirement. See id. at 142 ("Even assuming arguendo that the . . . agents exceeded the bounds of the warrant when they seized individual file without first searching them, we hold that that appellants have not shown that the agent's search resembled a general search.") It then examined the actions of the agents and concluded that the actions of the agents had "none of the hallmarks of a general search." Id. at 141. Instead, their actions ". . . suggest a fairly systematic inventory, not 'indiscriminate rummaging,' and a search for items enumerated in the warrant, not an 'exploratory' search for items not mentioned there." Id. Thus, the Second Circuit concluded that the first prong was not met, and it did not need to separately assess whether the government acted in good faith. Id. at 142.

In some instances, the conduct of the agents in this case resembled a general search. The agents systematically tagged the entirety of a text message chain based upon the presence of even a small amount of responsive material within the chain. This was done regardless of the relationship of the person to Chu — his wife, brother, or children — and his or her connection to the charged crimes. The agents also tagged entire chains of messages without regard to the timespan of the chain. Chu's text chain with his daughter encompasses almost twelve years, with its earliest messages dating back far earlier than Chu's alleged unlawful activities.

The Court understands that it is often appropriate to tag more than an individual message in order to show the context of a responsive message, and that there is no single way to define the outer limits of the quantity of messages necessary to show the context..[13] It may turn on the nature of the relationship between the individuals and the suspected time frame of the unlawful activities. There undoubtedly are instances where context requires the designation of an entire chain of messages, even in this case..[14] But designating as responsive an entire chain of communications spanning a significant period of time between close family members or, in one instance, a business associate, exceeds the bounds of reasonableness. This conduct resembles a general search, more akin to indiscriminate rummaging or a wide-ranging exploratory search than a "systematic inventory . . . and a search for items enumerated in the warrant." Shi Yan Liu, 239 F.3d at 141. This type of search provides the government with a trove of personal information about a person that may be later called upon for unforeseen uses.

On other hand, the tagging of a large quantity of mass mailing advertising and blank emails may have "exceeded the bounds of the warrant," but it is not indicative of indiscriminate rummaging for useful material not enumerated in the warrant nor of a general search.

As to the second prong of Shi Yan Liu, the government has proven that it acted in good faith. The agents' misguided use of their past practices regarding the tagging of entire text chains, (see e.g., Tr. 18, 177, 414), undoubtedly developed in a variety of instances including those dissimilar from this case, does not negate good faith. In following their past practices,

---

[13] In a recent controlled substance distribution case, the defendant had exchanged approximately 7,000 and 12,000 text messages over a number of years with two customers of his distribution business. United States v. Frias, 25 cr 346 (PKC) (transcript of Nov. 18, 2026). While the lawfulness of any search was not at issue, it is plausible that the entirety of the chain was related to the charged unlawful conduct.

[14] For example, tagging the entirety of the text message chain among Chu, his son, and a third party spanning less than seven months and containing 107 messages with portions plausibly shown to be within the warrants, does not resemble a general search. (See Kash Decl. Ex. C.)

there is no indication that they were actively seeking materials that reached beyond the scope of the warrant. Certainly, the systematic searching for and tagging of material showing a target's idiosyncrasies, indiscretions, strange beliefs, habits, practices, prior bad acts, or unrelated crimes would suggest bad faith. But there was none of that here. Kroll testified that he was unaware of any FBI or Department of Justice guidance on tagging of chains of text messages in a responsiveness review, and no evidence of such guidance emerged at the hearing. (Id. at 119.) As noted, there was no relevant restriction on the method of conducting the responsiveness review in the warrants.

In conducting the second-stage responsiveness review, the government is not required to use state-of-the-art technology or best organizational practices. Fourth Amendment jurisprudence does not favor a top-down structure over small team collaboration. Nor does the failure to use a uniform set of search terms condemn a responsiveness review as unreasonable. See United States v. Nejad, 436 F. Supp. 3d 707, 734 (S.D.N.Y. 2020) (Nathan, J.) ("[t]hough it may have been more desirable for the reviewers to have agreed upon a comprehensive set of search terms. . . , the review methodology was nonetheless reasonable under the circumstances.")

The four agents utilized the 13 categories of the warrant as their guiding star. (See, e.g., Tr. 31-32, 180, 183, 424.) They worked independently but assisted one another when needed. (See, e.g., id. at 380–81 (detailing Special Agent Rosenman's assistance to Special Agent O'Rourke in implementing more robust quality control).) Tagging an entire chain of emails as responsive if any portion of it was responsive was an established practice utilized throughout their careers; it was not concocted for this case. (See, e.g., id. at 18, 177, 414.) Nor did the agents try to hide their use of this practice. Special Agent Kroll informed one of the AUSAs on the case team that he was following such a practice, and the AUSA approved. (Id. at

19, 22.) The Court finds that the responsiveness review was conducted subjectively in good faith.

From an objective standpoint, there was no provision of the warrant that restricted the manner of the reasonableness review. Again, there is no evidence that a policy or guidance from the FBI or Department of Justice was violated or that training that was ignored. (See, e.g., id. at 118–19.) No judicial authority has been brought to the Court's attention condemning the specific practices utilized in this case. Thus, the Court also finds that a reasonable and well-trained prosecutor or law enforcement agent would not have known that his or her actions, in light of all circumstances, violated the Fourth Amendment. See United States v. Smith, 967 F.3d 198, 212 (2d Cir. 2020). Blanket suppression of the entire fruits of the search is not warranted..[15] But that does not end the matter.

"[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988); United States v. Hampton, 2026 WL 1689485 (2d Cir. June 11, 2026) (summary order) (citing and quoting Shi Yan Liu and Matias). "[T]he drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." Matias, 836 F.2d at 747 (emphasis in original). The Court has made no finding of "flagrant disregard" and has found good faith. Thus, the normal remedy of suppression and return of the described and referenced message chains is sufficient.

[15] In Ganias, an electronic search case with facts dissimilar from those presented here, the district court found the search to have been lawful and thus did not reach the question of good faith. 824 F.3d at 208. The en banc Court did not decide the merits of whether the agents' actions violated the Fourth Amendment but instead affirmed the district court on its finding on the record that the agents acted in good faith. Id. at 225–26. It held that "assuming, arguendo, that a Fourth Amendment violation occurred, suppression was not warranted." Id. at 225.

The Court suppresses in its entirety the text chains that were received at the hearing as DX 1, DX 2, DX 61 and DX 66..[16] Also, the Court will exercise its supervisory powers to exclude from evidence at trial any other material that was obtained by the warrants but exceeded their terms.

It is not necessary to reach the issue of spousal privilege at this juncture. See United States v. Lumiere, 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (Rakoff, J.) ("The Court likewise found no instances in which a court ordered blanket suppression because care was not taken to avoid reviewing privileged documents."); see also United States v. Wilson, 505 F. Supp. 3d 3, 12 (D. Mass. 2020) ("If [defendant] seeks to exclude the contents of those [spousal] emails at trial, he may do so via a motion in limine.")

## CONCLUSION

Chu's motion to suppress is GRANTED in part and DENIED in part. The Clerk is requested to terminate the motion at ECF 108.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
November 20, 2026

[16] In this context, the suppression of evidence seized in violation of the Fourth Amendment is synonymous with the exclusion of such evidence. See Mapp v. Ohio, 367 U.S. 643, 655 (1961) ("this Court . . . had steadfastly held that as to federal officers the Fourth Amendment included the exclusion of the evidence seized in violation of its provisions.")